CITIZENS TO END ANIMAL SUFFER-ING AND EXPLOITATION, INC., Doreen Close Lavenson, and, Mark Sommers, Plaintiffs,

v.

FANEUIL HALL MARKETPLACE, INC., Defendant.

Civ. A. No. 90–10722–T.

United States District Court, D. Massachusetts.

Aug. 27, 1990.

James A. Frieden, Boston, Mass., for plaintiffs.

Edward Raymond Lev, Lynn Peterson Read, Robert Buchanan, Sullivan & Worcester, Boston, Mass., for defendant.

## MEMORANDUM

TAURO, District Judge.

Plaintiffs are a non-profit corporation, Citizens To End Animal Suffering And Exploitation, and two of its members, Doreen Close Lavenson and Mark Sommers. They allege that defendant, Faneuil Hall Marketplace, Inc., infringed their First Amendment right of free expression when it arrested Lavenson and Sommers on grounds of criminal trespass for distributing literature on land leased by defendant from the City of Boston. Based upon that past action, and defendant's representation that it would arrest plaintiffs again under similar circumstances, plaintiffs seek to enjoin future interference with their freedom of expression.

### I.

On June 23, 1989, the individual plaintiffs, along with others, gathered at Faneuil Hall Marketplace ("the Marketplace")[1] to distribute leaflets and protest the inhumane treatment of calves used for veal. They urged passersby not to con-

---

**1.** Faneuil Hall Marketplace, one of the nation's foremost tourist attractions, is a commercial development of restaurants, food stands, cocktail bars, boutique shops, and pushcarts offering sundry arts and crafts. It has wide, open cobblestoned lanes separating three buildings that house these commercial enterprises. There is also a large public outdoor seating area. The Faneuil Hall Marketplace Corporation holds a ninety-nine year lease for the Marketplace, which consists of the Quincy Market, North Market, and South Market buildings, and the cobblestoned lanes between them and to the west of them. *See Affidavit of Robert O'Brien,* ¶ 2.

Plaintiffs' protest took place on the lanes separating the three buildings. These lanes were formerly public streets known as North and South Market Streets which, in coordination with the Faneuil Hall Marketplace development, were decommissioned and closed to vehicular traffic.

sume veal at the establishments located in the Marketplace. Plaintiffs claim that, as they and their fellow protesters were walking in a single line with pedestrian traffic on North and South Market Streets, they were stopped by defendant's security officers who allegedly had received complaints from a commercial tenant. The officers told the protesters that they could not picket or display signs on "private property."[2]

After the protesters refused to disperse, defendant's security officers summoned the Boston Police. The police responded quickly, but left without making any arrests, notwithstanding the protesters' refusal to disperse. Defendant's security officers then arrested Lavenson and Sommers for criminal trespass. The pair were handcuffed and taken to defendant's security offices, where they were detained until the Boston Police returned. Defendant swore out criminal complaints against Lavenson and Sommers in the Boston Municipal Court. These criminal proceedings were ultimately dismissed for lack of prosecution.

As a result of this incident, plaintiffs filed a five-count complaint against defendant, alleging: 1) violation of 42 U.S.C. § 1983; 2) violation of Mass.Gen.L. c. 12 § 11I; 3) false arrest; 4) malicious prosecution; and 5) abuse of process.

Presently at issue is plaintiffs' motion for a preliminary injunction, by which they seek to enjoin future interference with their freedom of expression. This motion raises issues of justiciability, state action, first amendment fora, and the propriety of injunctive relief. Each will be addressed *seriatim*.

## II.

A federal court may only decide actual cases or controversies. *See* U.S. Const. art. III, § 2; *Diamond v. Charles*, 476 U.S. 54, 61, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986) ("Article III of the Constitution limits the power of federal courts to deciding 'cases' and 'controversies.'"). To present a justiciable case or controversy, the plaintiff

must demonstrate "a realistic danger of sustaining a direct injury...." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (citation omitted).

[1] Plaintiffs have alleged a justiciable claim here. They wish to exercise their First Amendment rights at the Marketplace. *See Letter to Michael E. Spear* (Appendix B to *Affidavit of Doreen Close Lavenson*). Defendant arrested them for attempting to do so in the past, and filed a criminal complaint against them. At oral argument, defense counsel conceded that, if plaintiffs attempted another such protest on the premises, defendant would take the same action against them. These circumstances constitute an actual case or controversy, and justify this court's exercise of its equitable power. *See Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923) ("One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough."). *See also Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). The motion for preliminary injunction, therefore, is properly before the court.

## III.

Before deciding whether defendant can be enjoined from prohibiting speech on its premises, the court must undertake a two-step inquiry. First, the court must determine whether this defendant, an ostensibly private party, may be held to constitutional standards when it attempts to regulate activity on its premises. *See Hudgens v. National Labor Relations Board*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (absence of state action precludes application of constitutional standards). If so, the court must then characterize the forum at issue, thereby setting the constitutional standards by which defendant's regulations are to be judged. *See Cornelius v. NAACP Legal Defense and Edu-*

---

2. The characterization of this property as public or private is, of course, a central issue in determining whether plaintiffs' rights were violated. *See infra.*

*cational Fund, Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985) (scope of right of expression is determined by type of forum involved).

Plaintiffs contend that the public nature of the Marketplace makes the protections of the First Amendment applicable.[3] Defendant, on the other hand, argues that the Marketplace is private property to which the First Amendment does not apply. *See Hudgens,* 424 U.S. 507 (1976) (First Amendment inapplicable to privately-owned shopping mall).

### A.

The Constitution clearly restricts the power of the government to regulate speech. *See, e.g., Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973). Under certain circumstances, private parties may also be subject to these same constitutional standards. *See Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966) ("[c]onduct that is formally 'private' may become so ... impregnated with a governmental character" that it can be regarded as governmental action). The issue, therefore, is whether defendant's actions here may be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); *Ponce v. Basketball Federation of Puerto Rico,* 760 F.2d 375, 377 (1st

Cir.1985). Such a determination is "necessarily fact-bound," *Lugar,* 457 U.S. at 939, 102 S.Ct. at 2755, for "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).[4]

The Supreme Court has identified several factors for courts to consider in determining whether a party is a "state actor."[5] Specifically, three areas of inquiry are relevant: 1) whether there was a sufficient nexus between the state and the private actor which compelled the private actor to act as it did; 2) whether the private actor has assumed a traditionally public function; and 3) whether there is a sufficient "symbiotic relationship" between the state and the private actor so that the state may be recognized as a joint participant in the challenged activity. *See Blum v. Yaretsky,* 457 U.S. 991, 1004–05, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982); *Rendell–Baker v. Kohn,* 457 U.S. 830, 841–42, 102 S.Ct. 2764, 2771–72, 73 L.Ed.2d 418 (1982); *Ponce,* 760 F.2d at 377; *Cohen v. President and Fellows of Harvard College,* 568 F.Supp. 658, 659–60 (D.Mass.1983) (Tauro, J.), *aff'd* 729 F.2d 59 (1st Cir.1984), *cert. denied,* 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984).[6]

While only one of these areas of inquiry need be satisfied in order to find

---

**3.** Specifically, plaintiffs contend that the First Amendment applies to the Marketplace because: (1) the underlying property is owned in fee simple by the City of Boston; (2) Faneuil Hall traditionally has been a forum for public discourse in Boston; (3) the City of Boston extensively regulates the Marketplace; and (4) the lease of the Marketplace to defendant reserved an easement for public access over the leasehold. In addition, plaintiffs contend that defendant's agent acted "under color of state law" by arresting them.

**4.** It should be noted at the outset of any such inquiry that, while the principle of "state action" may be "easily stated, the question of whether particular ... conduct is private, on the one hand, or amounts to 'state action,' on the other, frequently admits of no easy answer." *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972).

**5.** These factors "are not tests in the traditional sense. More precisely, they are different methods of analyzing and appraising the facts and circumstances of a particular case." *Gerena v. Puerto Rico Legal Services, Inc.,* 697 F.2d 447, 449, n. 2 (1st Cir.1983).

**6.** The Supreme Court in *Rendell–Baker, supra,* considered a fourth factor, namely, the extent to which the defendant received and depended on federal funds. *Rendell–Baker* and its progeny make clear, however, that "receipt of government funds does not render the government responsible for a private entity's decisions concerning the use of those funds" and, therefore, it is not an independent factor to be considered. *Stone v. Dartmouth College,* 682 F.Supp. 106, 108, n. 1 (D.N.H.1988) (quoting *Gerena,* 697 F.2d at 450).

state action,[7] this case involves, as is shown below, both a private assumption of a traditionally public function, and a symbiotic relationship between defendant and the City of Boston.[8]

### 1. Public Function Analysis

■ In determining whether the Marketplace is a state actor because it performs a public function, "the relevant question is not simply whether a private group is serving a 'public function.'" *Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. at 2771. Rather, "the question is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Id.* (emphasis in original) (citations omitted).[9]

■ Notwithstanding the narrowness of this inquiry, defendant's conduct here is fairly construed as the performance of a "public function." As defense counsel conceded at oral argument, the lanes on which plaintiffs wish to protest are encumbered by an easement for public access.[10] Many pedestrians wholly uninterested in the Marketplace's offerings cross its lanes daily in travelling to the waterfront. Others simply stroll about the Marketplace, enjoying various shops and pushcarts, as well as the adjacent Faneuil Hall and Faneuil Hall Square. *Affidavit of Robert Guerra; Affidavit of Robert O'Brien.*[11] As such, the open lanes of the Marketplace are not unlike a public park which, as the Supreme

---

7. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157–66, 98 S.Ct. 1729, 1733–39, 56 L.Ed.2d 185 (1978) (implicitly recognizing that state action could be found under any alternative rationale). *See also*, Schneider, *The 1982 State Action Trilogy: Doctrinal Contraction, Confusion, and a Proposal for Change*, 60 Notre Dame L.Rev. 1150, 1177 (1985) (noting that, although it is "unclear from the *Blum* decision whether the Court now demands that all three 'principles' ... be satisfied in a single case ... [,] [i]t would be a significant departure from precedent for the Court to now require that all three requirements be met in order to establish state action.") *Cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982) (unclear "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation....").

8. This case does not satisfy the "nexus test," however. Under the nexus analysis, a government "'can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987), quoting *Blum v. Yaretsky*, 457 U.S. at 1004, 102 S.Ct. at 2786. Indeed, "the party seeking to establish that action of a private party violated the Constitution must be able to point to the specific act or actions of the government which in fact motivated the private action." *Ponce*, 760 F.2d at 378 (citation omitted); *see also Cohen v. President and Fellows of Harvard College*, 568 F.Supp. 658, 660 (D.Mass.1983) (Tauro, J.) (nexus analysis "focus[es] on whether the challenged action of the private entity was compelled or influenced by the government."). In the present case, plaintiffs have not offered evidence of such a high degree of involvement by the City of Boston in the decision by defendant to ban plaintiffs' protest.

9. This test has proven difficult to satisfy. *See, e.g., Blum*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (provision of nursing homes not an exclusively state function); *Rendell–Baker*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (education of maladjusted high school students not an exclusively state function); *Vincent v. Trend Western Technical Corp.*, 828 F.2d 563 (9th Cir. 1987) (maintenance of military equipment not an exclusively state function).

10. *See also Exhibit II, Attachment to Indenture of Lease dated as of 1974, between the City of Boston and the Boston Redevelopment Authority* ("The City hereby reserves unto itself ... a perpetual, non-exclusive easement, for the benefit of and use by the general public, for reasonable, peaceful and orderly pedestrian access and passage ... over and upon the surface of such portions of former North Market Street, former South Market Street, [etc.]").

11. Fanueil Hall, also known as "The Cradle of Liberty," is one of Boston's most significant historical buildings. It has served as the city's central political forum for over two and one-half centuries, and has long been a site of great oratory and political agitation. *See generally*, A.E. Brown, Faneuil Hall and Market (Lee and Shepard 1900); *see also*, A.J. Langguth, Patriots: The Men Who Started The American Revolution (1988) (town meetings held at Faneuil Hall to discuss Colonial response to British tyranny); C. Bahne, The Complete Guide to Boston's Freedom Trail (1990) at 27 ("Nearly every American war from 1812 to Vietnam has also been debated within these walls."). The parties do not dispute that Faneuil Hall and Faneuil Hall Square are still purely public areas.

Court held in *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966),[12] must be "treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law." *Id.* at 302, 86 S.Ct. at 490.[13]

Moreover, the pedestrian walkways here are similar to public streets,[14] the regulation of which is a "public function." Were this a case in which the City had simply authorized the Marketplace to *maintain* the public walkways, defendant's discharge of this duty might not be state action. *See, e.g., Johnson v. Pinkerton Academy,* 861 F.2d 335, 338 (1st Cir.1988) ("The maintaining of public roads would seem a classically state function, but this does not make a private contractor a state operator...."). But here, the Marketplace is acting as more than a private contractor. Its function goes beyond the mere maintenance of a public way. By prohibiting protesters from assembling in the lanes, the Marketplace is deciding who can use the public easement, and under what circumstances

12. In *Evans,* a former Georgia Senator devised to the City of Macon a "park and pleasure ground" for whites only. The city maintained the all-white park for years, but eventually decided to desegregate the park. Consequently, several individual managers of the park brought suit against the city to preserve the Senator's intentions. As a result of this lawsuit, the city resigned as trustee of the park, and three private individuals were appointed as trustees for the purpose of maintaining a segregated park. Several black citizens intervened, arguing that the racial limitation on the park was unconstitutional.

The Court concluded that, even if the park were maintained by private trustees, it was nevertheless sufficiently "public" to justify the application of constitutional standards to it. *Id.* It based its decision on the fact that the park had long been maintained by the city prior to being taken over by private trustees. The Court held: "[W]here the tradition of municipal control had become so firmly established, we cannot take judicial notice that the mere substitution of trustees instantly transferred this park from the public to the private sector." *Id.* at 301, 86 S.Ct. at 489. And, in a discussion of parks generally, the Court noted:

> The service rendered [to the community] even by a private park of this character is municipal in nature.... Golf clubs, social centers, luncheon clubs, schools such as Tuskegee was at least in origin, and other like organizations in the private sector are often racially oriented. A park, on the other hand, is more like a fire department or police department that traditionally serves the community. Mass recreation through the use of parks is plainly in the public domain, and state courts that aid private parties to perform that public function on a segregated basis implicate the State in conduct proscribed by the Fourteenth Amendment. *Id.* at 301–302, 86 S.Ct. at 490.

13. The similarity of the Marketplace to a municipal park is underscored by the absence of any discernable boundaries between the Marketplace and the immediately-adjacent, public areas, such as Fanueil Hall Square. The absence of such boundaries has proven to be critical in distinguishing between purely private shopping centers and shopping centers to which the Constitution applies. *See Hudgens v. NLRB,* 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976) ("'The town and the surrounding neighborhood ... can not be distinguished from the Gulf property by anyone not familiar with the property lines....'"), quoting *Marsh v. Alabama,* 326 U.S. 501, 502–503, 66 S.Ct. 276, 277, 90 L.Ed. 265 (1946); *Hudgens,* 424 U.S. at 518, n. 5, 96 S.Ct. at 1035, n. 5 ("'The principle difference[ ] between the two centers [is] that ... Lloyd Center is much more intertwined with public streets than Logan Valley.'"), quoting *Lloyd Corp. v. Tanner,* 407 U.S. 551, 575, 92 S.Ct. 2219, 2232, 33 L.Ed.2d 131 (1972).

Defendant argues, unconvincingly, that the boundaries are discernable because "[t]he outdoor areas are defined by physical barriers to vehicles," and that "demonstrators apparently recognize the private nature of the Marketplace, since relatively few incidents have occurred." The first of these arguments is unavailing because barriers to vehicles do not render an area "private" where it is otherwise fully open to pedestrians. The second argument, as well, is unavailing because it merely speculates, based on mere coincidence, as to whether the public is actually aware of the boundaries.

14. A similar analogy was drawn in *Fernandes v. Limmer,* 663 F.2d 619 (5th Cir.1981), in which the Fifth Circuit concluded that airport terminals, leased by private airlines from the State, were like public streets. The court reasoned that:

> The parallel between public streets and the crescent-shaped central concourses of the D/FW terminal buildings, where air travelers as well as the general public may shop, dine, imbibe, and sightsee, is clear and powerful.... The analogy between these terminal concourses and public streets is further strengthened by the lack of restrictions on public access to the commercial establishments located along the crescent-shaped passageways, whether or not persons must pass through security checkpoints first. *Id.* at 627.

they can use it. Rather than acting as a private contractor, therefore, the function performed by the Marketplace is more akin to that of a policeman.[15] This, it seems, is a function that has traditionally been the exclusive domain of the state.[16]

Indeed, the power to decide who can use a public easement goes beyond even that of a policeman. Unlike the policeman who merely executes decisions of policy, defendant here is actually *making* those policy decisions. Defendant's role is thus more like that of a legislature, which is even more clearly an exclusive state function. The essential purpose of the easement here is to ensure public access to the Marketplace. The exercise of control over the public's right to use the easement is subject to constitutional scrutiny, whether employed directly by the State or through delegation to a private party.

## 2. *Symbiotic Relationship Analysis*

 Under the "symbiotic relationship" test, actions of a private party are attributable to the State only where the State "has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961). Again, notwithstanding the narrowness of this inquiry,[17] there is present here, as there was in *Burton*, such a substantial degree of interdependence between defendant and the City that it is fair to construe their relationship as "symbiotic."

In *Burton*, the Court attributed state action to a private restaurant, located in a public parking garage, that discriminated against black customers. In reaching its conclusion, the Court placed great empha-

**15.** A similar distinction between a private contractor and a state actor was noted in *McQueen v. Druker*, 438 F.2d 781 (1st Cir.1971). In *McQueen*, the First Circuit found state action where the City had contracted with private parties to carry out its duty to provide for urban renewal displacees. The court concluded that the private parties were more than contractors because the function they contracted to perform was traditionally governmental. *Id.* at 784.

This distinction was further fleshed out in *Ponce*, wherein the court hypothesized:

Suppose, for example, that a municipality entered into a contractual relationship with a private developer to manage a public housing project with the result that only white individuals were accepted as tenants. Were the state or town to do nothing when confronted with the discriminatory screening policy, we might well conclude that the state's total abstention from the performance of its legislative function would be equivalent to state approval of private action. *See McQueen v. Druker*, 438 F.2d 781 (1st Cir.1971).

*Ponce*, 760 F.2d at 379.

Similarly, here, the City's abstention from the regulation of the public easement is equivalent to approval of defendant's regulation of the easement and, therefore, "state action."

**16.** The Supreme Court has been quick to point out that it "has never considered [whether] the private exercise of traditional police functions [is a 'public function.']" *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163–64, n. 14, 98 S.Ct. 1729, 1737–38, n. 14, 56 L.Ed.2d 185 (1978). Moreover, those lower courts that have faced the question have not had occasion to address it

squarely. *See, e.g., Collins v. Womancare*, 878 F.2d 1145, 1151–53 (9th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 865, 107 L.Ed.2d 949 (finding no state action on other grounds, court concluded that it was "unnecessary to reach the 'public function' argument...."); *Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir.1987) ("citizen's arrest" in airport was not "state action."); *Lee v. Estes Park*, 820 F.2d 1112, 1115 (10th Cir.1987) (no state action where private party merely reports criminal activity and action is ultimately taken by state officials). *But see, McQueen*, 438 F.2d at 784 (the provision of public housing, "while perhaps not so traditionally governmental as *parks, fire or police services*, . ⌐ is today one of the major concerns of most cities....") (emphasis added).

Nevertheless, it seems clear that defendant's action here—the regulation of a public way—is a "public function." One preeminent constitutional law scholar illustrates the point in this manner:

For example, deciding to cross the street when a police officer says you may is *not* ... a 'public function;' but authoritatively deciding who is free to cross and who must stop *is* a 'public function' whether or not the person entrusted under state law to perform that function wears a police uniform and is paid a salary from state revenues or wears civilian garb and serves as a volunteer crossing guard. L. Tribe, American Constitutional Law § 18–5 (2d ed. 1988)

**17.** *See Cohen v. President and Fellows of Harvard College*, 568 F.Supp. at 658 ("[T]he symbiotic relationship category is very narrow.").

sis on the fact that the restaurant leased its land from the State and was located in a public facility "dedicated to public uses," [18] and that the rent from the restaurant contributed to the support of the public facility. *Burton*, 365 U.S. at 723–24, 81 S.Ct. at 860–61.

This case involves many of these same indicia. First, as in *Burton*, defendant leases its property from the City.[19] The City continues to own the land in fee simple, having acquired it by eminent domain.

Second, the lanes between the three buildings are "dedicated to public uses." In *Burton*, the Court noted that the garage building in which the restaurant was situated existed for the public's benefit, pursuant to a state statute authorizing the development of "adequate parking facilities for the convenience of the public." *Burton*, 365 U.S. at 717, 723, 81 S.Ct. at 857, 861. Similarly, as noted above, the City of Bos-

ton here reserved an easement over the Marketplace's lanes for the public's access and passage. *See supra* note 10. Indeed, the City's overall purpose in leasing the premises to defendant was the rejuvination of the downtown area, all for the benefit of the community.[20]

Third, and most important, the City derives an economic benefit from defendant's policy of restrictions, at least as directly as that found in *Burton*.[21] In *Burton*, the Court concluded that the State profited from the restaurant's policy of discrimination, because the State's financial position was directly influenced by the restaurant's profits. Those profits, in turn, were enhanced by the policy of discrimination because, according to the restaurant's own argument, the restaurant would lose business if it did not discriminate. *Burton*, 365 U.S. at 724, 81 S.Ct. at 861. The Court found that this economic relationship was a

**18.** *See Edwards v. Lutheran Senior Services of Dover*, 603 F.Supp. 315 (D.Del.), *aff'd without opinion*, 779 F.2d 42 (3d Cir.1985) ("*Rendell–Baker* and *Blum* reaffirm that ... a court must find stronger indicia of state-private interdependence, *such as location on public property....*"). *Id.* at 321 (emphasis added).

**19.** Several lower courts have also considered the fact that the property is leased from the State to be a significant indicium of state action. *See, e.g., Fernandes v. Limmer*, 663 F.2d 619, 626–27 (5th Cir.1981); *International Society for Krishna Consciousness, Inc. v. Lee*, No. 75 Civ. 5388 (S.D. N.Y.1982) (LEXIS, Genfed library, Dist. file); *International Society for Krishna Consciousness v. Schrader*, 461 F.Supp. 714, 717 (N.D.Texas 1978). *Cf. International Society for Krishna Consciousness v. Lee* 721 F.Supp. 572 (S.D.N.Y. 1989) (private airlines settled case after magistrate concluded that they could be held liable for constitutional violations in privately-leased terminal areas).

**20.** For example, in the lease itself, the City expressly "recognize[d] that, in view of:

(a) The importance of the redevelopment of the Property to the general welfare of the community;
(b) The substantial financing and other public aids that have been made available by law and by the United States and the City for the purpose of making such development possible; ...
the qualification and identity of the Lessee and any Owner are of particular concern to the community and the Lessor."

*Indenture of Lease between Boston Redevelopment Authority and Faneuil Hall Marketplace, Inc.* ("The Lease"), dated February 21, 1975, § 14.02. In addition, in its Urban Renewal Plan, the City stated as its "Basic Goals:"

The basic goal of urban renewal action in the Downtown Waterfront—Faneuil Hall Area is to stimulate and to facilitate development efforts in the area, by eliminating those severe conditions of blight, deterioration, obsolescence, traffic congestion and incompatible land uses which hinder private investment in new development without the aid of governmental action, in order to (1) revitalize a key portion of downtown Boston; (2) upgrade the pattern of land uses close by the North End residential community; (3) establish a functional connection between the area and its surrounding districts....

*Downtown Waterfront—Faneuil Hall Urban Renewal Plan ("The Plan")*, § 201, incorporated by reference in The Lease. The Plan also stated as policy objectives, *inter alia*, the elimination of blighting conditions, prevention of erosion of property values, the strengthening of Boston's tax base, promotion of historic preservation, the stimulation of tourism, and the provision of "public ways, parks and plazas which encourage the pedestrian to enjoy the harbor and its activities." *The Plan*, § 202. *See also Id.* at § 902 (relating to plan's conformity with community objectives).

**21.** *See Ponce*, 760 F.2d at 382 ("[T]he key factor in determining the existence of a symbiotic relationship is whether the state profited from the discriminatory activity."), citing *Rendell–Baker, supra.*

direct one, noting that "the commercially leased areas were not surplus state property, but [instead] constituted a physically and financially integral and, indeed, indispensable part of the State's plan...." *Id.* at 723–24, 81 S.Ct. at 861.

Like the restaurant in *Burton*, defendant here argues that its business would suffer if it were to permit plaintiffs to demonstrate on the premises.[22] Perhaps even more so than in *Burton*, this downturn in business directly affects the City's economic goals, as the Marketplace is clearly an "indispensable" part of the City's plan. The City's primary purpose in leasing the property to defendant was to revitalize the downtown area. *See supra*, note 20. To this end, the City depends on the ability of the Marketplace to attract business to the area. *See id.* Consequently, to the extent that the Marketplace fails to attract business, the City's goal of revitalizing the downtown area is frustrated. As in *Burton*, therefore, the City derives a direct economic benefit from defendant's policy of restricting plaintiffs' access to the premises. Accordingly, the relationship between defendant and the City is sufficiently interdependent to be considered "symbiotic."[23]

For these reasons—namely, that defendant performs a "public function" and is involved in a "symbiotic relationship" with the City—it is fair to attribute defendant's action to the state and, accordingly, to examine defendant's conduct with constitutional scrutiny.

### B.

Under the First Amendment, a state actor may not restrict access to a forum without an appropriate governmental justification. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). The degree of interest a state must show to justify its restriction depends on the type of forum it is regulating. *Id.* There are three types of fora: 1) traditional, or "quintessentially" public;[24] 2) limited public;[25] and 3) nonpublic.[26] The more a forum resembles a traditional public forum, the greater an interest the state must show to justify restricting access. *Student Government Assoc. v. Board of Trustees of University of Massachusetts*, 676 F.Supp. 384, 386 (D.Mass.1987) (Tauro, J.), *aff'd* 868 F.2d 473 (1st Cir.1989).

If the Marketplace were either a traditional or limited public forum, defendant's restriction would have to be valid at least in terms of "time, place, and manner." *See Perry*, 460 U.S. at 45, 103 S.Ct. at 955 (in traditional public forum, content-based exclusions must be necessary to

---

**22.** Defendant specifically argues:

> Plaintiff's demonstration within the Marketplace injures its operations. Protests by groups of the size here involved ... during crowded periods obstruct passage by patrons of the Marketplace. Picketing targeted at specific Marketplace lessees [*i.e.*, veal-serving restaurants] injures their business....

*Defendant's Memorandum in Support of Motion To Dismiss* at 15.

**23.** This conclusion is bolstered by evidence that not only the City benefits from the relationship by realizing its policy objectives, *see McQueen*, 438 F.2d at 784 ("[T]he landlords are, in return for an assured consideration, ... helping the state realize its specific priority objective...."), but defendant receives economic benefits as well. *Cf. Burton*, 365 U.S. at 724, 81 S.Ct. at 861 ("It cannot be doubted that the peculiar relationship of the restaurant to the parking facility in which it is located confers on each an incidental variety of mutual benefits.").

Most significantly, defendant receives a very valuable leasehold at a very favorable price—$10.00/year. Moreover, the proximity of the Marketplace to many of Boston's historic—and purely public—areas enables defendant to profit from the passage of tourists through the Marketplace's terrain. While each of these benefits alone may not prove the existence of a symbiotic relationship, the totality of these circumstances do support such a finding.

**24.** A traditional public forum is a forum which "by long tradition or by governmental fiat [has] been devoted to assembly and debate...." *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

**25.** A limited public forum is a forum that is "generally open to the public even if [the state] was not required to create the forum in the first place." *Id.*

**26.** A nonpublic forum is a forum which "is not by tradition or designation a forum for public communication...." *Id.*

serve compelling state interest, but content-neutral exclusions are permissible if valid regulations of time, place and manner.) [27] To be a valid regulation of time, place, and manner, the restriction must be content-neutral, narrowly tailored to serve a significant government interest, and offer ample alternative channels of communication. *Id.* at 37, 103 S.Ct. at 948.

Defendant's restriction does not satisfy these requirements. First, it is not "narrowly tailored." The only content-neutral interest proffered by defendant in support of its restriction is that "protests by groups of the size here involved ... during crowded periods obstruct passage by patrons of the Marketplace." Leaving aside the question of whether this is a "significant" governmental interest, defendant's policy of arresting demonstrators is not narrowly tailored to this end. There is no suggestion that defendant attempted to reduce the bulk of the demonstration by, for example, requesting that the group break up into smaller segments and spread out through other parts of the area in order to remove obstructions to the patrons' access. Nor did defendant suggest that plaintiffs could resume their demonstration during a less-crowded period. Instead, defendant simply gave plaintiffs the choice of either leaving, or being arrested.

Second, defendant's restriction is not entirely content-neutral. While defendant does offer as a justification for the restriction the removal of obstructions to passage, it also stresses the harmful effects of the particular message of plaintiffs' pro-

test. Specifically, defendant argues that "[p]icketing targeted at specific Marketplace lessees injures their business." Presumably, then, if plaintiffs were protesting with regard to some other issue unrelated to the businesses in the Marketplace, defendant would see less reason to remove them from the premises. Defendant's justification for the restriction is thus, at least in part, tied directly to the content of the protest and, therefore, is not content-neutral.[28]

Although restrictions in a non-public forum need only be reasonable to be valid, *see United States v. Kokinda,* —— U.S. ——, ——, 110 S.Ct. 3115, 3120, 111 L.Ed.2d 571 (1990), the Marketplace is more than a nonpublic forum. As was stated above, a nonpublic forum is one which "is not by tradition or designation a forum for public communication...." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. Here, however, the Marketplace has both traditional and designated characteristics of a public forum.

For example, the entire Faneuil Hall area has long been a center for public debate and expression. *See supra,* note 11. And, while the lanes at issue were taken by eminent domain and leased to defendant, that was done under the express condition that they maintain their historic public character.[29]

Moreover, as noted above, the City reserved a public easement over the lanes. The lanes are used for access, for strolling about the Marketplace, and as a "historic

---

**27.** *See also, id.* at 46, 103 S.Ct. at 955 (In limited public forum, "[a]lthough a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum.")

**28.** Because the restriction is not content-neutral, it must, in order to be valid, be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Perry,* 460 U.S. at 37, 103 S.Ct. at 948. The shielding of veal-serving restaurants from the commercial effects of protestors' speech, however, cannot be considered a "compelling state interest."

**29.** For example, the City's Urban Renewal Plan, which is incorporated as one of the main pur-

poses of the Lease, stated with respect to the Faneuil Hall area:

> This area is one of the most valuable historic assets to the City of Boston, to the State of Massachusetts, and to the Nation.... It is intended that the historic uniqueness of this area be retained through a thoughtful blend of new construction, rehabilitation and conservation.... It is intended that the space formed by Faneuil Hall, the new Boston City Hall, the rehabilitated buildings along Faneuil Hall Square, and the proposed new building ... be so designed that the intimate pedestrian scale that once existed in this area again be recaptured.

*The Plan,* § 204(5).

pedestrian connection" to the purely and traditionally public adjoining areas. These lanes thus resemble public sidewalks. Although sidewalks are not public fora *per se, see Kokinda,* — U.S. at —, 110 S.Ct. at 3120–3121, ("[T]he dissent is simply incorrect in asserting that every 'public sidewalk' is a public forum"), the facts here establish that these lanes must be considered, at the least, as limited public fora.[30] *See id.* ("[T]he location and purpose of a publicly-owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum."). Because the Marketplace is at least a limited public forum, therefore, it is unnecessary to determine whether defendant's restrictions would satisfy the "reasonableness" standard applied to non-public fora.[31]

### IV.

Finally, the court must decide the appropriateness of injunctive relief here. A party is entitled to a preliminary injunction if it can establish: (1) a likelihood that it will succeed on the merits; (2) that it will suffer irreparable harm in the absence of injunctive relief; (3) that the balance of harms weighs in its favor; and (4) that issuance of the decree would not adversely affect the public interest. *See Vargas–Figueroa v. Saldana,* 826 F.2d 160, 162 (1st Cir.1987).

■ For the reasons detailed in § III, *supra,* plaintiffs have established a likelihood of success on the merits. Plaintiffs have also demonstrated that they would suffer irreparable harm from the threatened arrest. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Dombrowski v. Pfister,* 380 U.S. 479,

487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965). The balance of harms also weighs in plaintiffs' favor. Plaintiffs' harm is immediate and irreparable, whereas defendant will suffer, if at all, only a decrease in business. Finally, the public interest is advanced by preserving First Amendment protections over an area long associated with expressive activities.

### V.

The Faneuil Hall area is no mere commercial shopping mall with a Colonial theme. Rather, it is a marketplace of ideas, expression, and community, providing a unique monument and tribute to one of this nation's most cherished centers for public debate. While the private interests of the participating entrepreneurs are important, and must be respected and protected, they can never be permitted to overshadow the fundamental purpose of this special landmark.

Accordingly, and for all of the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction is hereby ALLOWED.

---

**30.** Indeed, the lanes are similar to the public street described in *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), which was "continually open, often uncongested, and constitute[d] not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people [could] enjoy the open air or the company of friends and neighbors in a relaxed environment." *Id.* at 651, 101 S.Ct. at 2566.

**31.** And, because the analysis is the same for both traditionally public and limited public fora, *see supra,* it is unnecessary to categorize the Marketplace as one or the other. *Cf. Kokinda* (Kennedy, J., concurring) (unnecessary to categorize sidewalk as public or nonpublic forum where regulation satisfies tests under either category).