**ONE WORLD ONE FAMILY NOW, a California Nonprofit Corporation registered to transact business in the State of Florida, and Gregory Scharf, an individual, Plaintiffs,**

v.

**CITY OF KEY WEST, a Florida Municipality, and E.R. Peterson, Chief of Police, Defendants.**

No. 94–10020–CIV–King.

United States District Court,
S.D. Florida.

May 3, 1994.

Scott S. Liberman, Krupnick, Campbell, Malone, Roselli, Buser & Slama, Fort Lauderdale, FL, David M. Liberman, Los Angeles, CA, for plaintiff.

Michael T. Burke, Johnson, Anselmo, Murdoch, Burke & George, Fort Lauderdale, FL, Adele V. Stones, Key West City Atty., Key West, FL, for defendant.

### ORDER GRANTING PRELIMINARY INJUNCTION

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes to this Court upon Plaintiffs' Application for Temporary Restraining Order (D.E. # 2) and Memorandum of Law in Support (D.E. # 3), filed March 21, 1994. Defendants filed their Memorandum of Law in Opposition on April 6, 1994 and the Court heard oral argument in Key West, Florida that day.

#### I. Factual Background

Plaintiff, One World One Family Now, is a California non-profit organization whose "mission is to educate the general public about the spiritual aspects of problems affecting the environment (spiritual ecology)." (Complaint, para. 10). Plaintiff Gregory Scharf is a representative for the organization for South Florida. (Complaint, para. 4). In furtherance of One World One Family Now's mission, Plaintiffs desire to set up portable tables at particular locations on the public sidewalks of Key West's commercial and historic district from which representatives of the organization can distribute literature, discuss issues of spiritual ecology with members of the interested public and display and sell T-shirts carrying messages related to the organization's religious tenets. (Complaint, para. 11 and 12).

On October 28, 1993, Plaintiffs sought permission from the City to conduct their activities at various locations within Key West's commercial district, including the intersection of Front and Duval Streets. Because Plaintiffs' original request was never resolved by the City, in January 1994, Plaintiffs sought the assistance of Ron Herron, Assistant City Manager. Through negotiations with Herron, Plaintiffs agreed to accept one of various alternative locations suggested by Herron: (1) a location on Front Street near the Duval intersection; (2) a location on Green Street near the Duval intersection; (3) a location in Mallory Square; and (4) a location on the sidewalk abutting Smathers Beach." (Complaint, para. 16). According to Plaintiffs, despite Herron's assurances that a permit would be issued as to an alternative location, the City refused to grant Plaintiffs a permit, informing them that their request required approval by the City Commission. (Complaint, para. 16 and 17).

At the February 1, 1994 City Commission meeting, the Commission approved the Smathers Beach location but referred the remaining location requests to the City's Historical Architectural Review Commission ("HARC"). (Complaint, para. 18). On February 14, 1994, the HARC rejected the Green Street location and referred the Mallory Square and Front Street locations to the City's police and fire departments for review. (Complaint, para. 19). Additionally, the HARC asked Plaintiffs to submit detailed design and site plans for these locations, which Plaintiffs apparently did and the HARC rejected. (Complaint, para. 19 and 20). Plaintiffs assert that police captain Edward Grantham informed them that if they sought to conduct their activities without the City's permission, they "would be arrested

for selling merchandise on the sidewalk, and would be put in jail." (Complaint, para. 21).

On March 21, 1994, Plaintiffs filed the Complaint in this action alleging that Defendants have wrongfully refused them a permit to place T-shirt tables on the public sidewalks of Key West's commercial and historic district through an unwritten permit scheme which operates to deprive Plaintiffs of their First and Fourteenth Amendment rights. As a result, Plaintiffs have filed the instant motion seeking preliminary injunctive relief.

## II. Analysis

To obtain a preliminary injunction, Plaintiffs have "the burden of proving: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) [Plaintiffs'] own injury outweighs the injury to [the City]; and (4) the injunction would not disserve the public interest." *Cheffer v. McGregor*, 6 F.3d 705, 710 (11th Cir.1993) (citing *Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1990).

The facts as alleged in the Complaint suggest that Plaintiffs have met these prerequisites entitling them to preliminary injunctive relief.

### A. Substantial Likelihood of Success:

#### 1. The sale of expressive T–shirts

To determine the likelihood of Plaintiffs' success on the merits, the Court must first determine whether the activity Plaintiffs desire to engage in constitutes "expressive activity" protected under the First Amendment. Plaintiffs intend to distribute literature, discuss issues such as global warming, toxic waste, vegetarianism and animal protection, and sell T–shirts containing a message related to the organization's mission. There is no dispute that the distribution of literature and discussion of issues is protected First Amendment activity. *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). *See also Thornhill v. Alabama*, 310 U.S. 88, 101–02, 60 S.Ct. 736,

744, 84 L.Ed. 1093 (1940) ("The freedom of speech … guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment."). The real dispute lies with the organization's plan to sell message-bearing T-shirts from portable tables set up on the City's sidewalks. Although it is well settled that T-shirts carrying messages related to one's political or religious mission constitute protected speech, *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576, 107 S.Ct. 2568, 2573, 96 L.Ed.2d 500 (1987) ("[W]earing a t-shirt or button that contains a political message … [is] protected speech even in a non-public forum."), the Supreme Court has not directly addressed the issue of selling expressive T-shirts on public streets. The Supreme Court has, however, long held that the fact that the expressive materials are sold does not alter the protection afforded the speech. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756 n. 5, 108 S.Ct. 2138, 2143 n. 5, 100 L.Ed.2d 771 (1988) ("Of course, the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."). *Accord Schaumburg v. Citizens for Better Environment*, 444 U.S. 620, 633, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980) (" 'Our cases long have protected speech even though it is in the form of … a solicitation to pay or contribute money, *New York Times Co. v. Sullivan*, [376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ].' " *Bates v. State Bar of Arizona*, 433 U.S. 350, 363, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977)); *Murdock*, 319 U.S. at 111, 63 S.Ct. at 874 ("[T]he mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise.").

Nonetheless, the Supreme Court has recognized that "the problem of drawing the line between a purely commercial activity and a religious one will at times be difficult." *Murdock*, 319 U.S. at 111, 63 S.Ct. at 874.[1] Caselaw distinguishing between commercial

---

1. The distinction between religious and commercial activity is important to the determination of the appropriateness of the regulation as the state may more freely regulate pure commercial speech.

speech and fully protected speech looks to the nature of the speech as a whole rather than parceling out the commercial characteristics of the activity from the fully protected whole. *See Riley v. National Federation of the Blind, Inc.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (holding that regulation requiring professional fund raisers to disclose to its audience that portion of the annual funds actually given to charity was subject to the test for fully protected expression, not the more deferential commercial speech principles, as the commercial portions of the speech were inextricably intertwined with the protected portions) and cases cited therein.

While the Supreme Court has not specifically addressed the issue of protected speech carrying commercial characteristics in the context of message-bearing T-shirt sales, the Ninth Circuit recently did so in *Gaudiya Vaishnava Soc. v. San Francisco,* 952 F.2d 1059 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992). In that case, the Ninth Circuit, interpreting Supreme Court caselaw, held that "when nonprofits engage in activities where pure speech and commercial speech are inextricably intertwined the entirety must be classified as fully protected noncommercial speech." *Id.* at 1066. The facts there are remarkable similar to the instant case. In *Gaudiya,* five nonprofit organizations that routinely sold various message-bearing merchandise including T-shirts, stuffed animals and jewelry challenged a San Francisco Police Code prohibiting non-profit organizations from selling in the Fisherman's Wharf or Union Square areas without a commercial peddler's permit, any items that have no intrinsic value other than to communicate a message. *Id.* at 1060. In that case the Ninth Circuit upheld the permanent injunction finding the San Francisco ordinance to be constitutionally invalid because it granted complete discretion in denying or granting such permits to the police chief.

In the case at bar, Plaintiffs have likewise challenged the constitutionality of the City's permit scheme on the grounds that it gives unbridled discretion to city officials to determine whether to grant or deny the permit and provides no guidelines or procedures to be followed. Like the plaintiffs in *Gaudiya,* the Plaintiffs before the Court want to sell message-bearing T-shirts directly related to their organization's mission[2] and have claimed that such activity is constitutionally protected.

Although *Gaudiya* is not controlling on this Court, given that it is a case of first impression for the Circuits, it is at the very least instructive. And, in light of the factual similarities between *Gaudiya* and the case at bar, it is likely to be persuasive. Thus, there exists a substantial likelihood that the sale of message-bearing T-shirts will be found to be fully protected First Amendment activity.

### 2. The maintenance of portable T-shirt tables on public sidewalks

The next question in the analysis is whether the setting up of portable tables on public streets in connection with the sale of expressive materials is likewise considered "protected conduct." *Gaudiya* did not address this issue and the cases dealing with the maintenance of structures on public streets are limited primarily to newsracks and newsstands.

Plaintiffs argue that the maintenance of portable tables is merely a means of disseminating protected material and such distribution of protected materials has long been protected by the First Amendment. (Plaintiffs' Application for T.R.O., p. 8). Plaintiffs compare their portable tables to newsracks, which have been held to be constitutionally protected, and urge the Court to extend the rational of the newsrack cases to the facts in this case. Specifically, Plaintiffs cite the Court to *Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1196 (11th Cir.1991), in which the Eleventh Circuit held that "there is 'no doubt' that the right to distribute and circulate newspapers through the use of newsracks is protected by the first amendment." Analogizing the sale of expressive T-

---

**2.** Defendants have not challenged Plaintiffs' claim that the T-shirts sought to be sold bear a message directly related to "spiritual ecology;" therefore, for purposes of this application, the Court will assume the truth of the allegation.

shirts to the distribution of newspapers via newsracks, Plaintiffs argue that the right to distribute their message-bearing T-shirts through sales conducted from portable tables is likewise protected by the First Amendment.

Defendants on the other hand contend that Plaintiffs do not have a First Amendment right to maintain T-shirt tables on the public sidewalks. (Defendants' Response, p. 9). While it is clear that the Supreme Court has extended First Amendment protections to the distribution of protected material, *Lovell v. Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) (extending First Amendment protection to the distribution of leaflets on public streets), Defendants argue that the this protection is not so broad as to include portable T-shirt tables. Defendants cite the Court to *Graff v. Chicago,* 9 F.3d 1309, 1314 (7th Cir.1993) for the proposition that "no person has a constitutional right to erect or maintain a structure on the public way." In that case, the Seventh Circuit held that the maintenance of a newsstand on a public street is conduct, not constitutionally protected speech, and upheld the City's ordinance regulating such structures. Defendants urge the Court to find that Plaintiffs intended use of portable T-shirt tables is like the newsstand in *Graff* and is thus unprotected conduct which can be readily regulated.

It is not surprising that the parties have cited no Supreme Court cases in support of their positions, because the Supreme Court has not directly addressed the issue presented in this case. The Supreme Court has merely intimated that the use of newsracks on public fairways is constitutionally protected First Amendment activity, *See Lakewood, supra* (licensing of newsrack placement on public streets subject to First Amendment challenge), but it has not directly addressed the extent to which the First Amendment protects the maintenance of structures on public streets in connection with protected speech. In the absence of such authority, the Court is left with the various Circuit Court opinions addressing the protection afforded newsracks and newsstands. The Court must therefore determine whether portable T-shirt tables are more like the newsracks in *Sentinel* or the newsstands in *Graff.*

The First Amendment protection afforded newsracks in *Sentinel* and the Supreme Court precedent, *Lakewood,* was premised upon a finding that "a newsrack, as a source of news, is inextricably tied to the publication it contains" and is thus commonly associated with expression. In suggesting that newsracks are constitutionally protected activity, both courts expressed a concern that newsracks—which provide for the distribution of only one particular publication at a time—by their very nature, raise the danger that regulations which are not narrowly tailored could result in the chilling of certain speech. *Graff,* 9 F.3d at 1316. In *Graff,* the Seventh Circuit found that newsstands do not inherently present those same dangers. Distinguishing newsstands from newsracks, the Court explained:

> Newsstands are large, permanent-type structures. They are constructed, and once in place they are not easily moved. Newsstands do not present one viewpoint; rather they supply many and varying editorial opinions. Newsstands shelter a business operator and his operation; they do not merely dispense or hand deliver newspapers. Newsstands also are more likely to obstruct the views of pedestrians and automobile drivers. In short, newsstands compared to newsracks are much larger, more permanent structures that occupy a significant portion of limited sidewalk space.

*Graff,* 9 F.3d at 1315.

The portable T-shirt tables more closely resemble the newsracks in the *Sentinel* case. The tables would simply facilitate the sale of the expressive T-shirts by providing a surface on which to place the items. Like the newsrack, the tables would be used to advocate one particular religious viewpoint and therefore discretionary regulation of their use raises the danger of censorship of certain viewpoints. The fact that the tables would be portable rather than permanent structures upon the city's sidewalk also suggests that the table is closely tied to the expressive activity rather than being purely commercial conduct. And, while the Court recognizes

that tables would restrict the flow of traffic on a portion of the sidewalk, it is not inconceivable that regulations regarding the size and precise positioning of the tables could be adopted to minimize the table's interference with pedestrians. As the *Graff* court made clear, size is relevant to the determination of whether the activity sought to be protected is speech or conduct. *Graff*, 9 F.3d at 1315, n. 4. Given these factors, the portable T-shirt tables are more analogous to the newsracks in *Sentinel* than the newsstands in *Graff*, and therefore they would seem to fall within the constitutional protections on expressive activity.

### 3. The City's permit scheme

Plaintiffs challenge the City's unwritten permit scheme as facially unconstitutional because it allegedly grants unfettered discretion to grant or deny permits to city officials. "In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 737–38, 13 L.Ed.2d 649 (1965). *Accord Lakewood,* 486 U.S. at 764, 108 S.Ct. at 2147–48.[3]

It is axiomatic that the sidewalks upon which Plaintiffs seek to engage in their expressive activity are a quintessential public forum. *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983) (" '[P]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks and parks, are considered, without more, to be 'public forums.' "). Therefore, having found that the activity Plaintiffs seek to engage in is likely to be classified as protected non-commercial speech, the City's regulations would be subject to strict constitutional scrutiny. *Burson v. Freeman,* — U.S. —, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). To pass constitutional muster, the City's regulations must be con-

tent-neutral time, place and manner restrictions which are narrowly tailored to serve a significant government interest and which leave open ample alternatives for communication. *Id.* at —, 112 S.Ct. at 1850.

Plaintiffs argue that the City has no regulations or procedural safeguards in place to govern its permit scheme. According to Plaintiffs, the City Commission, in conjunction with the HARC, have unrestricted discretion to determine whether or nor to grant a permit. To the contrary, Defendants argue that the City has valid time, place and manner restrictions on its books which provide constitutional limitations on Plaintiffs' proposed activities. Specifically, Defendants point to (1) an ordinance requiring persons who want to sell T-shirts to the public for consideration to apply and obtain a license to engage in such activity; (2) an ordinance prohibiting the outdoor display and sale of merchandise within the City's historic district and which prohibits mobile vendors from using the City's sidewalks or Duval and Front Street for the display and sale of goods or services; and (3) an ordinance prohibiting persons from obstructing the free travel or passage of any pedestrian on a sidewalk.

While the City's ordinances are facially content-neutral, they do not appear to be narrowly tailored to serve a significant government interest. Indeed, these ordinances do not provide a coherent permit scheme for regulating expressive activity such as Plaintiffs'. None of the ordinances cited by Defendants provide specific regulations regarding the permit/license application processes. Nor do they provide criteria to guide city official in determining whether to grant or deny a permit application. Instead, they simply indicate what information an applicant must provide to obtain a permit without providing standards upon which an applicant can rely.

The ordinance that seems most likely to apply to Plaintiffs' proposed activity is the HARC ordinance requiring certificates of appropriateness for construction, maintenance or demolition of structures within the historic

---

**3.** Thus, Defendants' argument that Plaintiffs have not applied for an occupational license is without merit.

district.[4] While this ordinance sets up a framework for obtaining certificates of appropriateness and provides for a review process of HARC decisions, the ordinance appears to lack substantive limitations on the HARC's discretion to determine which applications to grant or deny. Given the breadth of the statute, and the fact that it appears to restrict protected First Amendment activity, the apparent absence of such guidelines or standards precludes a finding that ordinance is narrowly tailored enough to withstand constitutional scrutiny.

Whether the other ordinances cited by Defendants would even apply to Plaintiffs' proposed activity is subject to question,[5] however, assuming their applicability, these ordinances contain even more constitutional infirmities. The mobile vendors license ("MVL") and occupational license ordinances do not even provide a time period in which the decision-makers must consider an application. "Rather, an application could languish indefinitely before the C[ity], with the [applicant's] only judicial remedy being a petition for mandamus." *Lakewood*, 486 U.S. at 771, 108 S.Ct. at 2151. The danger of delay caused by the absence of a time frame for the application process is aptly demonstrated by the fact that Plaintiffs' application laid idle somewhere in the City Manager's office for over a month with no response. In addition, the MVL and occupational license ordinances provide no route for appeal of a denial of an application.[6] Thus, the City has unbridled discretion to grant or deny such licenses with no threat that their decision will be reversed on review because there is no review.

■ The Court is cognizant of the government interests the City seeks to protect with these ordinances, however, given the broad discretionary powers vested in the government officials, it would be difficult to find that the City's ordinances are "narrowly tailored" to meet those interests.[7] For instance, while the City has a legitimate interest in the safety of its already crowded public sidewalks, a regulation imposing an outright ban on conduct that encompasses protected First Amendment activity is overly broad. Instead of barring all such activity, the City could impose size and time restrictions on activities conducted thereon. Similarly, the Court recognizes the City's interest in licensing all business transactions within its limits, however, where licensing is broad enough to act as a prior restraint upon speech, the Constitution requires that the ordinance provide guidelines to restrain unfettered governmental discretion to decide who can speak and who can not.

4. *See* §§ 16.01–16.10 of Key West Code of Ordinances.

5. The mobile vendors ordinance applies to portable vendors but seems specifically directed toward "vehicle" type vendors, a classification within which Plaintiffs' portable tables do not fit. *See* § 107.25–107.37 of the Key West Code of Ordinances. While the occupational license ordinance requiring those persons engaged in or advertising for business transactions to obtain a license would seem to apply to the sale of T-shirts, it is not clear whether Plaintiffs' are indeed "holding themselves out to be engaged in business." *See* § 91.01 of the Key West Code of Ordinances.

In addition, it is not clear that the ordinance prohibiting the exterior display of merchandise in the City's historic district would bar Plaintiffs' proposed activity. *See* § 101.125 of Key West Code of Ordinances. Contrary to the impression created by Defendants' pleadings, the ordinance does not prohibit all external displays of merchandise in the historic district, for it includes a provision directed at businesses conducted from accessory structures, such as a cart, booth, porch or patio, which simply states that "all merchandise and goods shall be contained within the structure, and shall not be expanded to include any other display hung, draped, freestanding, below, beside or above said structure ..." § 101.125(b)(2) of Key West Code of Ordinances. Thus, Plaintiffs' proposed conduct may be restricted by this ordinance, but it would certainly not be banned.

6. The HARC ordinance is the only ordinance cited by Defendants which provides for an appeal. However, an appeal process is no substitution for standards limiting the discretion of government officials who make the licensing and permitting decisions in the first instance.

7. "As an application of the requirement that restrictions be narrowly tailored, a law cannot condition the free exercise of First Amendment rights on the 'unbridled discretion' of government officials. *City of Lakewood*, [486 U.S. at 755–56] 108 S.Ct. at 2143." *Gaudiya*, 952 F.2d at 1065.

Finally, while the City's interest in aesthetics is undoubtedly legitimate, *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 806, 104 S.Ct. 2118, 2129–30, 80 L.Ed.2d 772 (1984), the issue for this Court is whether the City's aesthetic interest in preserving the character and appearance of the historic district is "sufficiently substantial to justify its use as a basis for restricting protected expression," *Multimedia Publishing Co. v. Greenville–Spartanburg Airport Dist.*, 991 F.2d 154 (4th Cir.1993) (citing *Vincent*, 466 U.S. at 805, 104 S.Ct. at 2128–29), and whether the "the application of the ordinance in this case responds precisely to the substantive problem which legitimately concerns the City." *Vincent*, 466 U.S. at 810, 104 S.Ct. at 2132. At this point, the City has not shown that its aesthetic concerns are sufficient enough to warrant the abridgment of First Amendment rights. Nor has the City pointed to any standards that guide the HARC in making licensing decisions affecting the aesthetics of the City's historic district. Instead, it appears that the HARC has broad discretion to determine which structures and activities are aesthetically compatible with the historic district and which are not. " 'Such discretion grants officials the power to discriminate and raises the specter of selective enforcement on the basis of the content of speech.' *N.A.A.C.P., Western Region v. Richmond*, 743 F.2d 1346." *Gaudiya*, 952 F.2d at 1066. Thus, the vesting of such discretionary power in city officials makes the HARC ordinance constitutionally suspect.

#### 4. Summary

In sum, a preliminary analysis of Plaintiffs' claims suggests that the proposed sale of expressive T-shirts from portable tables along the public fairways of Key West's historic district constitutes protected First Amendment activity that can only be restricted by content-neutral time, place and manner restrictions. Because the City's ordinances as written do not appear to be narrowly tailored to meet significant City interests, the Court finds, for purposes of this preliminary injunction application, that there is a substantial likelihood that Plaintiffs will succeed on the merits.

### B. Irreparable Harm

Having shown the likelihood of success on the merits of their constitutional claim, Plaintiffs have thereby shown that they have suffered and will continue to suffer irreparable harm from the chilled speech that results from the threatened arrest. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Citizens to End Animal Suffering & Exploitation Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65 (D.Mass.1990) (finding that the prior arrests and continued threat of arrests to plaintiffs who wished to exercise their First Amendment rights at Faneuil Hall constituted irreparable harm for purposes of granting a preliminary injunction).

### C. Plaintiffs' Injury v. City's Injury

Plaintiffs have already suffered irreparably from the loss of their First Amendment rights caused by the six months that have passed since Plaintiffs first applied for a permit allowing them to conduct their expressive activities. If injunctive relief is not granted, Plaintiffs face the prospect of arrest if they engage in the sale of their expressive T-shirts at any of the sites located within the City's historic district. Thus, their freedom of speech will continue to be restrained.

The injury to the City that will be inflicted by permitting Plaintiffs' expressive activity is not of such constitutional dimension. The potential injury to the City involves aesthetic and safety concerns. Certainly, the City of Key West has valid concerns regarding the preservation of the character and appearance of its historic district. However, the City has not shown that the presence of a T-shirt table along the City's sidewalk will so alter the character of the district to outweigh the chilling effect on free speech that would result from banning the tables. And, while the City's public safety concerns of insuring an unrestricted path for the flow of pedestrian traffic is legitimate, the dangers to pedestrians that the portable tables might pose do

not seem to be so great as to warrant denial of injunctive relief.

Thus, absent a showing that the City's potential injury is substantial, the seriousness of the injury caused by allegedly unconstitutional restraints on fundamental rights weighs in favor of a preliminary injunction.

### D. Public Interest

■ The Supreme Court has long held that there is a strong public interest in the free flow of ideas amongst people.[8] In this case, the preliminary injunction would further that interest by allowing Plaintiffs to disseminate information and educate the public about their religious tenets and thus protect the marketplace of ideas. The public's interest in safeguarding the fundamental rights of the First Amendment outweighs any competing public interest in the preservation of the historical district and maintenance of wholly unrestricted public walkways.

### III. Conclusion

For these reasons, it is therefore

ORDERED and ADJUDGED that Plaintiffs' Application for Preliminary Injunction be, and the same is hereby, GRANTED. Defendants are hereby enjoined from enforcing their announced policy against the sale of expressive T-shirts from portable tables located in the historic district of Key West. Specifically, Defendants are enjoined from enforcing or attempting to enforce the ordinances discussed herein, by arresting Plaintiffs, issuing citations or summons to Plaintiffs or taking Plaintiffs into custody for selling their T-shirts from tables located on the sidewalks of the City's historic district. This preliminary injunction shall remain in full force and effect pending final adjudication of this case or until further order of the Court.

DONE and ORDERED.

---

8. *See e.g. Pacific Gas & Elec. v. P.U.C. of California,* 475 U.S. 1, 8, 106 S.Ct. 903, 907–08, 89 L.Ed.2d 1 (1986) ("By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information."); *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 1415–16, 55 L.Ed.2d 707 (1978) ("The First Amendment, in particular, serve significant societal interests.").