**FIRST UNITARIAN CHURCH OF SALT LAKE CITY; Utahns for Fairness; Utah National Organization for Women and Craig S. Axford, Plaintiffs,**

v.

**SALT LAKE CITY CORPORATION, a Municipal corporation, Defendant,**

**Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints, Intervenor.**

No. 2:99–CV–912–ST.

United States District Court,
D. Utah,
Central Division.

May 4, 2001.

**1158**

Mark J. Lopez, American Civil Liberties Union, New York City, Stephen C. Clark, Amer. Civil Liberties Union, Salt Lake City, UT, for First Unitarian Church of Salt Lake City.

Stephen C. Clark, Amer. Civil Liberties Union, Salt Lake City, UT, for Utahns for Fairness, Utah Nat. Organization for Women.

Steven W. Allred, Roger F. Cutler, Boyd A. Ferguson, Lynn H. Pace, J. Wesley Robinson, Salt Lake City Attorney's Office, Salt Lake City, UT, for Salt Lake City Corp., Dee Dee Corradini, Ross C. Anderson.

R. Willis Orton, Von G. Keetch, Alexander Dushku, Kirton & McConkie, Salt Lake City, UT, for Corporation of Presiding Bishop of Church of Juses Christ of Latter-Day Saints.

Mark J. Lopez, Amer. Civil Liberties Union, New York City, Stephen C. Clark, Amer. Civil Liberties Union, Salt Lake City, UT, for Craig S. Axford.

## ORDER GRANTING DEFENDANT'S AND INTERVENOR'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

STEWART, District Judge.

This matter came before the court on January 2, 2001, for hearing on Defendant City's and Intervenor's Motions for Sum-

mary Judgment and Plaintiffs' Motion for Partial Summary Judgment.

# I INTRODUCTION

Plaintiffs want the right to stage demonstrations for the expression of their political and religious beliefs on property that was formerly Main Street between South Temple and North Temple and is now a privately-owned Church Plaza. Defendant City sold the disputed property (the Property) to the Intervenor, which now owns and maintains a Church Plaza on the Property. Plaintiffs seeks declaratory and injunctive relief that restrictions on the use of the City's retained pedestrian easement across the Church Plaza violate their rights under the First Amendment and to Equal Protection under the federal constitution and under the Establishment clauses of the U.S. and Utah constitutions. The parties all move for summary judgment. The court finds no material issues of fact and grants summary judgment against Plaintiffs and in favor of the City and the Intervenor.

# II

Plaintiffs are the Unitarian Church, the Utah National Organization of Women, Utahns for Fairness and an individual, Craig Axford. The defendant is Salt Lake City corporation, seller of the surface rights to the portion of Main Street located between South Temple and North Temple. Intervenor is the Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints (CPB), purchaser of the Property. The CPB is the property-holding corporation that conducts the temporal affairs of the Church of Jesus Christ of Latter Day Saints (LDS Church).

The Property consists of a parcel formerly containing the street and sidewalks of Main Street, between North Temple and South Temple streets. The Property is located between two city blocks owned by the CPB. The block to the west of the disputed Property is the well-known Temple Square, site of buildings of religious and historic interest. The block to the east is known as the Church Administration Block and contains buildings housing administrative functions of the LDS Church as well as buildings of historic interest. CPB's Ex. 5 Nielsen Aff. ¶ 7 and Maps 3, 5 and 6.

On April 13, 1999, the Salt Lake City Council, in a 5–2 vote, passed Ordinance No. 28 of 1999, which authorized the sale of the surface rights for the Property pursuant to several conditions and the Warranty Deed, including a pedestrian easement, as agreed to by the CPB and the City. In order to sell the surface rights to CPB for the express purpose of allowing CPB to build the Church Plaza, defendant City closed the portion of Main Street that formerly occupied the Property. Previously, in 1993, the CPB or the LDS Church acting through Reserve Property Inc., purchased the subsurface rights to the Property for the purpose of building a parking garage and held a right of first refusal for the surface rights. A parking garage was built under the Property shortly before construction began on the Church Plaza in May 2000. The Church Plaza was dedicated in October 2000.

On April 27, 1999, the City, acting through the Mayor, executed the Special Warranty Deed which contains a reservation of easement for pedestrian use. The Warranty Deed also preserves for the City an uninterrupted view corridor over the Property, a right of reverter, plus emergency and public safety easements and easements for public and private utilities.[1]

The Property's $8.124 million purchase price is the full market value without any

---

1. These easements are not at issue in this case.

reduction for the City's reserved easements, right of reverter or preservation of the view corridor. Cordova Aff. ¶¶ 18 and 20.

The pedestrian easement (hereinafter "easement") is expressly limited to pedestrian access: "an easement over and across the surface of the Property for pedestrian[2] access and passage only;" provides the Property shall be available for access for such pedestrian "access and passage at all times, both day and night," and provides no perimeter fences shall be erected on the North or South Temple right of way. Special Warranty Deed at § 1.3. The easement provides the City (the Grantee) "may allow the general public to use this easement for pedestrian access and passage only" but all such use is subject to several conditions, which conditions form the basis of this lawsuit. *Id.* The Warranty Deed contains integration and severability clauses and specifically provides that the pedestrian easement can be modified or terminated by written agreement of the City and the landowner (CPB).

The Warranty Deed provides the pedestrian easement is expressly subject to the following conditions as follows:

2. *Conditions, Limitations and Restrictions.* Notwithstanding anything to the contrary in this instrument, the easements reserved herein are subject to the following conditions, limitations and restrictions:

\*   \*   \*   \*   \*   \*

2.2 *Right to Prevent Uses Other Than Pedestrian Passage.* Nothing in the reservation of use of this easement *shall be deemed to create or constitute a public forum, limited or otherwise* on the Property. Nothing in this easement *is intended to permit any* of the following

enumerated or similar activities on the Property: *loitering, assembling,* partying, *demonstrating, picketing, distributing literature,* soliciting, begging, littering, consuming alcohol beverages or using tobacco products, sunbathing, carrying firearms (except for police personnel), *erecting signs or displays, using loudspeakers or other devices to project music, sound or spoken messages, engaging in any* illegal, *offensive, indecent, obscene, vulgar, lewd or disorderly speech, dress or conduct,* or otherwise disturbing the peace. Grantee *shall have the right to deny access to the Property to persons who are* disorderly or intoxicated or *engaging in any of the activities identified above.* The provisions of this section are intended to apply only to Grantor and other users of the easement and *are not intended to limit or restrict Grantee's use of the Property as owner thereof, including, without limitation, the distribution of literature, the erection of signs and displays by Grantee, and the projection of music and spoken messages by Grantee.*

2.3 *Right to Exclude Habitual Violators.* Grantee may prohibit and *lawfully prevent access to the Property by individuals who:* (a) have threatened or intentionally caused harm to leaders or members of the Church of Jesus Christ of Latter-day Saints; (b) have threatened or intentionally caused damages to buildings or property owned or used by the Grantee or by the Church of Jesus Christ of Latter-

---

**2.** Bicycles and leashed dogs may be walked across the pedestrian easement; skate boards, roller blades and roller skates are not allowed. Special Warranty Deed at § 1.3.

Day Saints; or (c) *have on more than one previous occasion entered on the Property and engaged in activities identified in section 2.2* above.

3. Enforcement. *Grantee may use all lawful means available to owners of private property to prevent any uses of the easements which are contrary to the provisions of this instrument.*

Warranty Deed 1–3 (underlining in original, italicized emphasis added).

## III

### A.

Plaintiffs seek declaratory judgement that the walkway areas of the Property are, like the city sidewalks formerly on the Property, a public forum where expression is protected by the First Amendment. They contend that despite the sale the walkways retain their status as a public forum and the City and the CPB could not alter that status by sale or by "fiat." Plaintiffs contend that the restrictions in the pedestrian easement contained in the Warranty Deed violate their rights under the state and federal constitutions and various federal civil rights statutes. Plaintiffs bring the following claims:

### B. First Claim—First Amendment

Plaintiffs' First Claim is based upon the First Amendment protections for freedom of expression and association. Plaintiffs contend that the Property remains a public forum where their right to expression may not be restricted; that the provisions of the pedestrian easement are facially invalid restrictions on their ability to engage in expression on the Property; that the restrictions are vague, arbitrary and discriminatory; that the restrictions are government-sanctioned content and viewpoint discrimination because the restrictions favor the LDS Church and its beliefs and opinions. Plaintiffs contend the restrictions violate the First Amendment as made applicable by the Fourteenth Amendment; the Civil Rights Act of 1871 and 42 U.S.C. §§ 1983 and 1988.

### C. Second Claim—Establishment Clause

Plaintiffs contend the City is violating the Establishment Clauses of the First Amendment of the U.S. Constitution and the Utah Constitution (Article 1, Section 4) and 42 U.S.C. §§ 1983 and 1988, by its conduct in allegedly: authorizing the CPB to prohibit speech it finds offensive while simultaneously allowing the CPB unfettered use of the Property to promulgate is own message; authorizing the CPB unbridled discretion over which members of the public will be allowed to use the public easement, an alleged traditional state function; endorsing the LDS Church, and entangling the same in governmental functions without secular purpose; purporting to dedicate a park-like public forum for the exclusive control of a religious organization; unconstitutionally blurring the distinction between church and state property giving the impression that the LDS Church occupies a privileged position and that the City endorses that Church's messages.

### D. Third Claim—Equal Protection

Plaintiffs contend the City violated their constitutional rights to equal protection of the laws under the First, Fifth and Fourteenth Amendments of the U.S. Constitution, the Utah Constitution (Article 1, Section 24) and 42 U.S.C. §§ 1983 and 1988 by imposing or allowing imposition of vague, arbitrary and discriminatory restrictions on the public's right to use the Property while simultaneously allowing the CPB and those of whom it approves unrestricted access. Plaintiffs contend that the restrictions are not related to and do not serve any compelling or substantial state interest, and constitute invidious discrimination with the purpose and effect of disfavoring Plaintiffs' speech in favor of that of

the LDS Church. In addition, Plaintiffs contend that their rights to engage in lawful conduct on the Property pursuant to the easement is subject to the invidious discrimination "through the administrative and legal machinations of the City government." This last position is a reference to Plaintiff's position that the restrictions in the easement were somehow sneaked by the public in order to obtain approval for the sale.

### E. Relief Sought

Plaintiffs seek injunctive and declaratory relief, basically the same relief for each claim. Plaintiffs seek an injunction as follows; an injunction against Defendants violating their constitutional rights; and, an injunction prohibiting the CPB from enjoying exclusive control and use of the Property for its own expressive purpose until and unless Plaintiffs are granted equal access and equal rights to use the Property.

Plaintiffs additionally seek declaratory judgment that the Property is a public forum; that the City has violated Plaintiffs' constitutional rights regarding the alleged public forum; that the restrictions in the deed/easement violate their constitutional rights by discriminating on the basis of content/viewpoint and are therefore null and void; and, that Defendant is required to promulgate and administer reasonable constitutionally permissible regulations on access to and enjoyment of the Property. Plaintiffs also seek attorneys fees and costs.

### IV

Plaintiffs contend a condition known as Condition 15, proposed by the Salt Lake Planning Commission (an advisory board), was deleted from the terms of the sale without adequately informing the public that it would not be a condition of sale. Condition 15 would have required that "there be no more restrictions on the use of the space that are more restrictive than is currently permitted at a public park." In 2000, the City Council passed Ordinance No. 29 of 2000, which clarified the Council intended to exclude Condition 15 from the deed. This action mooted a separate lawsuit regarding the Property by plaintiff Axford.

Although the Plaintiffs make much of the facts leading up to the sale, the Intervenor is correct that those facts are not relevant to the issues of summary judgment on Plaintiff's claims. Therefore, to the extent the facts leading up to the sale are disputed, they are not material. What is material in this challenge to the restrictions in the pedestrian easement is the language of that easement and the nature of the Property to which that language is applied.

### V

Each party brings a summary judgment motion. The standard on summary judgment is well-known:

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, we examine the factual record and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *Bullington*, 186 F.3d at 1313.

As the moving parties, defendants shoulder the "initial burden to show that there is an absence of evidence to support the nonmoving party's case." *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir.1995) (internal quotation marks and citation omitted). If defendants meet this burden, it falls to plaintiff to "identi-

fy specific facts that show the existence of a genuine issue of material fact." *Id.* "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Id.* (internal quotation marks and citation omitted). *Clinger v. New Mexico Highlands Univ. Bd. of Regents,* 215 F.3d 1162, 1165 (10th Cir.2000).

> An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *See id.* If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)....

*Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998)

The court will address the summary judgment motions in connection with each of Plaintiffs' three claims. However, the court must first address ripeness.

## VI

■ The easement restrictions at issue have not yet been enforced or applied by Property owner CPB or Defendant City. The parties have not raised an issue of whether there is a case or controversy that is ripe for decision. *See Capital Bonding Corp. v. New Jersey Supreme Court,* 127 F.Supp.2d 582, 597 (D.N.J.2001) ("Ripeness is a prerequisite to all federal actions, including those for declaratory or injunctive relief, and is sufficiently impor-

tant that courts are required to raise the issue *sua sponte* even though the parties do not."). Thus, the court must examine the issue of ripeness *sua sponte* despite the parties' desire to have a constitutional issue decided.

In order for a claim to be justiciable under Article III, it must be shown to be a ripe controversy. "[R]ipeness is peculiarly a question of timing," *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements," *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In short, the doctrine of ripeness is intended to forestall judicial determinations of disputes until the controversy is presented in " 'clean-cut and concrete form.' " *Renne,* 501 U.S. at 322[, 111 S.Ct. 2331] (quoting *Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 584, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947)).

As a general rule, determinations of ripeness are guided by a two-factor test, " 'requiring us to evaluate both the fitness of the issue for judicial resolution and the hardship to the parties of withholding judicial consideration.' " *Sierra Club v. Yeutter,* 911 F.2d 1405, 1415 (10th Cir.1990) (quoting *Abbott Labs.,* 387 U.S. at 149[, 87 S.Ct. 1507]). In determining whether an issue is fit for judicial review, the central focus is on "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." 13A Wright, Miller & Cooper, Federal Practice & Procedure, § 3532 at 112. To this end, courts frequently focus on whether a challenged government action is final and whether determination of the merits turns upon strictly legal issues or requires facts

that may not yet be sufficiently developed. *See Sierra Club,* 911 F.2d at 1415; *El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 495 (1st Cir.1992). In assessing the hardship to the parties of withholding judicial resolution, our inquiry " 'typically turns upon whether the challenged action creates a "direct and immediate" dilemma for the parties.' " *El Dia,* 963 F.2d at 495 (quoting *W.R. Grace & Co. v. United States EPA,* 959 F.2d 360, 364 (1st Cir.1992)).

The customary ripeness analysis outlined above is, however, relaxed somewhat in circumstances such as this where a facial challenge, implicating First Amendment values, is brought. *E.g., ACORN,* 835 F.2d at 739. Thus, while it is true that "the mere existence of a statute ... is ordinarily not enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms," *National Student Ass'n v. Hershey,* 412 F.2d 1103, 1110 (D.C.Cir.1969), in the context of a First Amendment facial challenge, "[r]easonable predictability of enforcement or threats of enforcement, without more, have sometimes been enough to ripen a claim," *Martin Tractor,* 627 F.2d at 380. The primary reasons for relaxing the ripeness analysis in this context is the chilling effect that potentially unconstitutional burdens on free speech may occasion:

> First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss. In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any *inhibiting chill.*

13A Wright, Miller & Cooper, Federal Practice and Procedure § 3532.3 at 159, *see also ACORN,* 835 F.2d at 740.

Thus, our ripeness inquiry in the context of this facial challenge to New Mexico's election law statute focuses on three elements: (1) hardship to the parties by withholding review; (2) the chilling effect the challenged law may have on First Amendment liberties; and (3) fitness of the controversy for judicial review. Our ripeness inquiry is not to be applied mechanically but rather, with flexibility, *Sierra Club,* 911 F.2d at 1416. *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499–1500 (10th Cir. 1995) (underlined emphasis added and citations partially deleted).

On the issue of ripeness, it is important to note the types of activities the Plaintiffs want to conduct on the Property. Plaintiff Unitarian Church wants to pursue its objectives of spiritual enlightenment and social justice for all regardless of status such as race, gender, disability and sexual orientation, through "public dialogue and demonstrations." It contends some of its members have been previously escorted from unspecified CPB Property for such activities and therefore it reasonably fears they will be barred temporarily or permanently from use of the public easement. First Amended Complaint at ¶ 4.

Plaintiffs Unitarian Church and Mr. Axford also contend they will be forced to avoid the easement because using it will expose them to the sight of unwelcome governmentally-endorsed religious messages. First Amended Complaint at ¶ 4.

Plaintiff Utahns for Fairness wanted to use the Property in 1999 to hold a silent protest by encircling Temple Square with persons holding hands, including the disputed Property sold to CPB and now used as the Church Plaza. First Amended Complaint at ¶ 20 and Wood Dep. at 27 (attached to Pl.'s Opposition to Defendant's and Intervenor's Motions) (Mr. Wood is the member of plaintiff Utahns

for Fairness who organized the protest) and Wood Dep. at 12 and 43 (CPB's Ex. 2).

Plaintiff National Organization of Women, (NOW), alleges it has demonstrated on the disputed Property in the past and wishes to do so in the future. First Amended Complaint at 6 and CBP's Ex. 68 (Malin Dep. at 6) (Ms. Malin was NOW's President/coordinator at the time of filing suit).

All of the Plaintiffs say they wish to use the Property to demonstrate, to espouse and to express their messages on an equal basis with the LDS Church. Plaintiffs have submitted evidence that they will be unable to do so because of the easement's restrictions.

Thus, this facial First Amendment challenge to the easement's bans against demonstrating, assembling, picketing, distributing literature, erecting signs or displays, using devices to project spoken messages or music is ripe because the bans create a "direct and immediate dilemma" for Plaintiffs that could place an "inhibiting chill" on their First Amendment right to free speech. *New Mexicans for Bill Richardson,* 64 F.3d at 1499–1500.

However, claims based upon the possible future enforcement of the "offensive, indecent, vulgar, lewd or disorderly speech, dress or conduct" provision of section 2.2 and the "Right to Exclude Habitual Violators" provision of section 2.3 of the easement may not be ripe (*see* below).

### VII Summary Judgment on First Amendment Claim

■ The parties agree that the sidewalks of Main Street were a public forum before the sale and as a result, the First Amendment protected the exercise of free speech thereon. See e.g. *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420, (1988)("wherever the title of streets may rest, they have immemorially been held in trust for the use of the public" and finding streets don't lose character

as public forums because they are in a suburb) (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423(1939)); *U.S. v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (government may not transform the character of otherwise ordinary and publicly owned sidewalk by including it a statutory definition of publicly owned property that is not public forum). However, although all parties recognize that the sidewalks on the Property were formerly a traditional public forum, the parties strongly dispute the effect of the sale and reserved pedestrian easement on the previously-existing right to exercise First Amendment freedoms on the Property.

The CPB moves for Summary Judgment because it contends the public forum was lawfully closed when the sale of the Property closed the street, transformed the physical character of the Property and changed its principal use. In support, the CPB cites the Tenth Circuit's case *Hawkins v. City and County of Denver,* 170 F.3d 1281 (10th Cir.1999). The CPB contends that because the Property is now privately owned for a religious purpose, the Property is not a speech forum of any type subject to the constitutional restraints claimed by Plaintiffs.

The City moves for Summary Judgment on the basis that upon closure and sale the traditional public forum was altered, amended and vacated by changing the character, nature and use of the Property; that the retention of a pedestrian easement did not preserve a public forum status where the agreement between the parties provided otherwise, and that private property is not burdened by public forum status. The City, like Intervenor CPB, relies upon the Tenth Circuit's *Hawkins* case. The City specifically addresses the freedom of association portion of Plaintiffs' complaint contending that there is no right

to associate on private property belonging to another.

Plaintiffs move for partial summary judgment. They contend the undisputed facts show that the Property includes thoroughfare sidewalks that are a public forum, that the restrictions to which the City agreed cannot constitutionally be enforced, and, they seek a declaration that the restrictions are void. Plaintiffs contend this is a situation where the Property's status as a public forum continues despite the sale and the Warranty Deed's declaration that the sale doesn't create a public forum. Plaintiffs rely on the line of cases beginning with the "company town" case, *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (constitutional restrictions applied to a privately owned town which performed public functions "traditionally the exclusive prerogative of the State"). They also rely on such cases as *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (Court disregarded sham transfer of a City Park made to avoid prohibitions against racial segregation by government); *Citizens to End Animal Suffering v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65 (D.Mass.1990) (public forum status of property remained despite its lease to a private corporation); and *Venetian Casino Resort, L.L.C. v. Local Joint Executive Board of Las Vegas*, 45 F.Supp.2d 1027 (D.Nev.1999) (sidewalk adjacent to casino on private property enjoyed public forum status).

The *Hawkins* case is the controlling legal authority. *Hawkins* instructs that government may close a First Amendment public forum by *inter alia*, selling the property, changing its "physical character" or "principal use." 170 F.3d at 1287–88.

Moreover the fact that the Galleria was constructed on what used to be a public street does not render it a traditional public forum. The government may, by changing the physical nature of the property, alter it to such an extent that it no longer retains its public forum status. *See ACLU of Nevada v. City of Las Vegas*, 13 F.Supp.2d 1064, 1074–75 (D.Nev.1998). As stated by Justice Kennedy in his *Lee* concurrence:

> In some sense the government always retains authority to close a public forum, by selling the property, changing its physical character, or changing its principal use.

*Hawkins*, 170 F.3d at 1287 (citing Justice Kennedy's concurrence in *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 699, 112 S.Ct. 2711, 120 L.Ed.2d 541 (1992) (challenge to Port Authority's ban on distribution of literature in airport)) (citations partially omitted).

This case is a stronger case than *Hawkins* for the closure of the former public forum because in this case the City sold the Property for its full market value while in *Hawkins* the City and County of Denver continued to own the property with only some small parts leased to private business.

It is undisputed in this case that the new property owner, CPB, now has total responsibility for the maintenance of the Property. This fact alone distinguishes the case from *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), cited by Plaintiffs for the proposition that a city can't "strip" the nature of a public forum and its protections of First Amendment rights by simply selling the Property or intending to end the public forum status. In *Evans*, the City at issue transferred record ownership, in the form of changing trustees, to a city park, while continuing to maintain and control the property. The Supreme Court held that if "the municipality remains entwined in the management or control of the park, it remains subject to the constraints of the Fourteenth Amendment." 382 U.S. at 301,

86 S.Ct. 486. In this case, there is no allegation that the City continues to be involved in the maintenance [3] or the operation of the Property or other facts [4] to show *Evans* is applicable.

Turning to the issue of whether the public forum was closed by changing its physical character, Intervenor CPB has produced evidence that the physical character of the Property has been materially altered. It is undisputed that the old sidewalks were destroyed and the new walkways are different from, and are in different places than, the former city sidewalks. It is undisputed that the area where the walkways were is now in a landscaped ecclesiastical park. Upon entering the Church Plaza, the walking surface turns abruptly to distinct "reddish-grey granite pavers." CPB's Ex. 5 at ¶ 19. There are security bollards (posts) at each entrance to prevent motor traffic from entering the Church Plaza. *See* Bauer Aff. Ex. I. The bollards, street lights and garbage cans are identical to those used on the adjacent Temple Square and Church Administration Block and the nearby Conference Center. Ex. 4 at 30. The Church Plaza's entrances are marked by large planters placed on large stone structures containing waterfalls. *Id.* Exs. C, D, G, I & M and CPB Ex. 5 at ¶ 21. Unlike the cases where the walkways are identical to the public sidewalks surrounding and attached to them, in this case, as in *ACLU v. City of Las Vegas*, 13 F.Supp.2d 1064, (D.Nev.1998), all of the surroundings alert the pedestrian that he or she has entered an enclave that is distinct from the public area. As in *ACLU*, there is distinctive paving, special lighting, and landscaping. Further, it is undisputed that there are identifying signs at the entry of the Church Plaza and there are religious statuary and symbolism throughout the Church Plaza, all of which alert the pedestrian to the religious theme of the area. *E.g.* CPB Ex. 4 at ¶¶ 28–30 and Ex. 5 at ¶¶ 20–22.

It is undisputed that a major component of the Church Plaza is the large reflecting pool designed to reflect and enhance the Salt Lake LDS Temple (Temple), a building of religious purpose which is located on the adjacent Temple Square. Ex. 5 at 27. There are grade elevations, grassy areas, and distinctive plantings distinguishing the Church Plaza from nearby areas. *Id.*

In opposition, Plaintiffs have produced evidence that the Church Plaza was designed with pedestrian traffic in mind. Plaintiffs' evidence includes the pictures and drawing attached to the Affidavit of Robert Bauer showing unblocked pedestrian access along the North to South edges of the Church Plaza, although the access curves gently around the reflecting pool and planters. However, these pictures also show clearly the "enclave" nature of the Church Plaza. As revealed in those pictures, any pedestrian could not fail to understand that he or she is not walking on the public sidewalk of that part of the City but is instead crossing a private Church Plaza. *See Lewis v. Colorado Rockies Baseball Club*, 941 P.2d 266, 273 (Colo.1997) (holding governmentally owned sidewalks leased by private entity were public forum where "the "architectural design and layout of the sidewalks and walkways fail to indicate to the public that they have entered a private area.").

---

**3.** Cost of construction of the Church Plaza, its underground parking garage and the estimated $200,000 annual maintenance costs for the Church Plaza are the exclusive responsibility of the CPB as property owner. CPB Ex. 4 at ¶ 23.

**4.** Further, as noted below, the Property was purchased for and is operated as an ecclesiastical park, designed and used to further religious purposes. This distinguishes the Property from the traditional public park-like nature of the property in *Evans* or *Faneuil Hall.*

Where the undisputed facts show the nature of the Property has been changed so that the Church Plaza is clearly distinguishable from the surrounding streets and sidewalks, the Plaintiffs have not raised an issue of fact that its physical character has not been so materially changed as to end its status as a public forum sidewalk.

*Hawkins* also holds that a public forum can be closed by changing its principal use. In this respect the Intervenor's and Defendant's evidence is unchallenged. Where as before there was a road and vehicular traffic, there is now only pedestrian traffic. The Intervenor's statistics are undisputed on the use of the Church Plaza as an ingress and egress for the buildings on the adjacent, and privately owned, blocks into which the Church Plaza now flows. Persons using the Church Plaza include persons entering the Temple (4,500 a day), persons employed at various LDS Church-owned office buildings on the Church Administration Block (145 a day at Church Administration Building, 100 a day at Relief Society Building, 3,100 a day at Church Office Building; 600 employees at Joseph Smith Building) or visiting various LDS Church-owned buildings in the complex. (600 daily visitors/tourists at Church Office Building; 500 daily diners and 1200 daily film-goers at the Joseph Smith building, 650 daily diners at Lion House and 650 daily visitors at the Beehive House). CPB's Ex. 62 at ¶ 5. The Intervenor's evidence is unchallenged that these uses constitute the "vast majority" of pedestrian use of the Church Plaza. Ex. 20. In addition, as an adjunct to and now major entrance to Utah's most-visited tourist attraction, Temple Square, the Church Plaza provides egress and ingress (but not sole egress and ingress) for tourists who will visit Temple Square but who will not enter the Temple. One of the former entrances to Temple Square was closed, and a new east opening in the 12 foot high wall sur-

rounding Temple Square links the Church Plaza directly to the formerly inaccessible inner courtyard of the Temple. CPB's Ex. 5 ¶¶ 25 and 26. In addition to allowing pedestrian traffic to enter Temple Square, the opening allows the Temple to reflect in the new pool unobstructed by the tall wall that otherwise surrounds Temple Square. CPB's Ex. 5 ¶¶ 25, 27–28. Further to the north and west of the Property is a block containing the Church Conference Center. This Center seats 21,000 and has over 15,000 weekly visitors. CPB's Ex. 5 ¶ 7 and CPB's Ex. 62 at ¶ 5.

The Church Plaza allows access of pedestrians along many east-west paths enabling free-flow of persons between sites at Temple Square and those at the Church Administration Block. There are no clear boundaries marking the entries of the paths back and forth between the Church Plaza and the Church Administration Block. Ex. 5 ¶¶ 17, 33.

The Intervenor's evidence is also undisputed that the Church Plaza now serves various functions incompatible with its former functions as a city street and city sidewalks. As noted above, the signs and religious statuary and displays signal to the pedestrian that the Church Plaza is a religious enclave. The Property's new functions include spreading the LDS Church's religious message, celebrating religious themes, celebrating the "majesty and beauty" of the Temple, building good will for the LDS Church, enhancing the experience of couples married in the Temple by providing them a "spectacular" setting for wedding pictures, establishing an association between the LDS Church and an atmosphere of beauty and serenity, and preventing urban decay near the LDS Church's sacred sites and its world-wide headquarters. Ex. 4 ¶ 24 and 26.

In response to all the above-discussed undisputed evidence, Plaintiffs offer the

conclusory statement that the Property remains a throughway. However, because Plaintiffs provide no information on the relative number of persons so using the Property as a throughway, the evidence is undisputed that the principal uses of the Property have changed.

In *Hawkins*, the area in question no longer formed part of the City's automotive, bicycle or transportation grid and was not generally, although it was occasionally, used as a throughway. In this case, the Church Plaza is no longer part of Salt Lake City's automotive or other motor vehicle transportation grid and bicycles can traverse the Property only if "walked." Although the Property remains part of the pedestrian transportation grid via the easement, the undisputed facts show the Property's physical character and principal uses have been altered to such an extent that it is clearly a walkway through an enclave area and not part of the City's public sidewalks.

Where the undisputed evidence shows the public forum character of the Property has been closed by selling the Property, changing its physical character, and changing its principal use, under *Hawkins*, it is no longer a public forum.

Plaintiffs contend that under the cases *Venetian Casino Resort, L.L.C. v. Local Joint Executive Board of Las Vegas*, 45 F.Supp.2d 1027 (D.Nev.1999) and *Citizens to End Animal Suffering v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65 (D.Mass.1990), the property retains its character as a public forum because the private property owner is performing a public function of maintaining sidewalks. As the parties recognize, there is a narrow exception to the rule announced in *Hudgens v. National Labor Relations Board*, 424 U.S. 507, 521, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), that the First Amendment guarantee of free expression has "no part to play" in a case involving picketing on private property because a privately owned and self-contained shopping mall is not the functional equivalent of municipality within the meaning of *Marsh, supra.* That exception applies where the private party is performing a public function that has been traditionally performed exclusively by the municipality, namely the maintenance of thoroughfare sidewalks. This was the exception relied upon in *Venetian Casino Resort*, 45 F.Supp.2d 1027 and *Faneuil Hall Marketplace*, 745 F.Supp. 65.

*Venetian Casino* is not applicable because of a dispositive fact in that case; namely, the nature of the sidewalk there as parallel to a public road and to "facilitate pedestrian traffic in daily commercial life *along the Las Vegas Strip*" as well as provide access to the casino. 45 F.Supp.2d at 1034–35 (underlined emphasis added). The sidewalk at issue in *Venetian Casino* paralleled the busy state highway known as the "Las Vegas Strip." The sidewalk was moved sideways from the state-owned property to private property in order to meet twin objectives of building a new casino and widening the highway. The casino agreed to build and keep open a sidewalk on its own property. The temporary sidewalk built on casino property looked somewhat different from the public sidewalks which it adjoined, but was otherwise indistinguishable in form and function. The *Venetian Casino* court held that "[t]horoughfare *sidewalks parallel to the main public street* in a city, that allow citizens to move from one part of the city to the next, have traditionally been exclusively owned and maintained by the government." 45 F.Supp.2d at 1034 (underlined emphasis added). The casino's sidewalk was therefore subject to the "very rare" exception announced in *Marsh, supra,* of imposing constitutional restraints on private property because the property owner is performing a traditional public function. *Id.* at 1035. The *Vene-*

*tian Casino* court declined to grant a TRO preventing labor union protests on the sidewalk holding that it was a public forum despite being on private land. Further, the *Venetian Casino* court noted that the casino's sidewalk, unlike the Property at issue in this case, was not a specific destination in and of itself.

In this case, there is no longer a main street, or any street, on the Property. The street has been eliminated and a completely different use made of the Property. There is no daily commercial life along a road to facilitate. Instead, there is an ecclesiastic park, a destination in and of itself for picture taking, for viewing statuary and other religious displays, and similar activities. Because the physical character and principal purpose of the Property have been so altered, the maintenance of a pedestrian easement across the Property is not the maintenance of a public function that subjects the private property owner to constitutional limitations that constrain municipalities.

In *Faneuil Hall,* the area at issue was formerly a historic and important public forum. The City owned the property but leased it under a long term lease with a public easement. *Faneuil Hall* is distinguishable in several respects: the "City continue[d] to own the land in fee simple," [5] there were no discernable boundaries between the area and the nearby public areas, Faneuil Hall and Square were adjacent to the disputed property and were themselves historically important public forums that at the time of the case remained public areas, and, the lessor had a private security force that arrested the protestors. 745 F.Supp. at 70–71 and n. 10. The *Faneuil Hall* court held that if the City had simply authorized the lessor

"to maintain the public walkways, its discharge of that duty might not be state action." 745 F.Supp. at 71–72. However, because the lessor's security force decided who could use the easement and physically prohibited protestors from using the area,[6] its actions were held to be more akin to that of a policeman, a function that has traditionally been the exclusive domain of the state. *Id.*

The Intervenor here is distinguishable from the lessor in *Faneuil Hall* because Intervenor is not exercising police power over who uses the easement. Instead, its security policy clearly shows that the City police need to be called to remove anyone. See CPB's Ex. 4 ¶ 32 and Pls.' Ex. 20 at § 2(c) ("West Church Plaza Security Policy") (If a person violating the restrictions refuses a request to discontinue conduct or leave, "the Salt Lake City Police Department will be summoned, unless the nature of the conduct requires immediate lawful intervention by Church representatives, such as when the person presents an imminent danger to himself, others, or property.").

The same reasons that distinguish *Faneuil Hall* and *Venetian Casino* also distinguish other cases cited by Plaintiffs. In *Jackson v. City of Markham, Ill.,* 773 F.Supp. 105 (N.D.Ill.1991), the sidewalk at issue was on state property, maintained by public funds and paralleled the public highway in the traditional manner of public sidewalks, all facts distinguishing it from this case.

In *Thomason v. Jernigan,* 770 F.Supp. 1195, 1200 (E.D.Mich.1991), the public sidewalk easement in question was parallel to a cul-de-sac built on a public street easement over private property. In *Tho-*

---

**5.** A fact the *Faneuil Hall* court held of import to the "symbiotic relationship" test but not to the public function test. 745 F.Supp. at 72.

**6.** The private security officers arrested, handcuffed and detained the protestors at their security offices. 745 F.Supp. at 67.

*mason* it was also undisputed that the sidewalks were indistinguishable in form and function from the nearby public sidewalks to which they were attached. Further, in *Thomason,* the court held that the City's action could be invalidated because the vacation of the public easement was for the express purpose of eliminating a public forum on the sidewalk on private property used by a single group of protestors. The facts of this case show the public forum status of the Property was eliminated for all groups of potential public protestors, regardless of the content of their messages. Further, the *Thomason* court's position that a city council's action can be invalidated if it destroys a public forum is incompatible with *Hawkins.* In *Hawkins,* the Tenth Circuit held that a public forum could be cut off by a variety of means, including its sale.

The Court finds by purchasing the Property and creating thereon a religiously oriented pedestrian plaza connecting two privately owned blocks of property, the CPB sufficiently changed the physical character and principal use or function of the Property so as to terminate its status as a public forum.

■ Although the Property is not a public forum, Plaintiffs still contend that the easement is a public property right to which constitutional protections apply. *Hawkins* enumerated designated public fora and nonpublic fora as the two other types of government property subject to constitutional protections.

■ Intent is necessary to establish a designated public forum. *Hawkins,* 170 F.3d at 1286. There is no such intent in this case and in fact there is just the opposite, an express acknowledgment between the private buyer and the governmental seller that the easement is not intended to create a public forum of any kind.

■ "Nonpublic fora" include any remaining government property that is not by tradition or designation a forum for public use. The undisputed fact is that the only remaining Property interest of the City, and therefore the public use, are extremely limited easements. The pedestrian easement is itself extremely limited even without the §§ 2.2 and 2.3 restrictions and conditions because it authorizes "pedestrian access and passage only."

Intervenor CPB contends that a limited pedestrian easement is not a sufficient property right belonging to the government to constitute a nonpublic forum within the meaning of *Hawkins.*

Plaintiffs contend that it is and move for partial summary judgment. They contend that even if the property is no longer a public forum, they seek declaration that the easement is a public property right and that the easement's restrictions are not reasonable and violate the First Amendment and the Due Process Clause because they restrict speech according to viewpoint. Plaintiffs note the easement expressly recognizes the property owner's right to distribute literature, erect signs and displays and project messages and music, all activities banned for users of the pedestrian easement. Easement Section 2.2. Plaintiffs rely on *ACLU of Nevada v. City of Las Vegas,* 13 F.Supp.2d 1064 (D.Nev.1998), a preliminary injunction case where the court found the ACLU was not likely to prevail on its claim that an enclosed downtown mall that covered part of Las Vegas' downtown was still a public forum; yet the court held that the ACLU was likely to prevail on its claim that the mall was a non-public forum and restrictions placed on all picketing except labor disputes were not rationally related to the government interest. As evidence the restrictions are not rationally related, Plaintiffs point to the fact that the landowner is

allowed to pass out literature, erect signs, have a kiosk, etc., while pedestrians are not.

The cases cited for restrictions on use of non-public fora involve property owned and/or controlled by the government or a governmental agency and include a broad range of property types. *See Cornelius v. NAACP,* 473 U.S. at 806, 105 S.Ct. 3439 (the CFC, the federal employees charitable fund-raising program administered by the federal government is nonpublic forum); *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (airport terminal owned by port authority is non public forum); *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (sidewalk used for access to post office is nonpublic forum).

■■■■ Having considered the undisputed evidence, the court finds that the limited pedestrian easement is a governmentally owned property right that could be considered a nonpublic forum. As such the court must find that the restrictions are rationally related to a legitimate governmental purpose. The following rules apply to nonpublic fora:

> In a nonpublic forum, the government has much greater latitude to restrict protected speech. The law draws no distinction between content-neutral and content-based restrictions in a nonpublic forum. Provided the restriction is reasonable in light of the purpose served by the forum and is "not an effort to suppress expression merely because public officials oppose the speaker's view," it does not violate the First Amendment. *[Arkansas Educ. Television Commission v.] Forbes,* [523 U.S. 666], 118 S.Ct. at 1641 [, 140 L.Ed.2d 875 (1998)]; *see also, e.g., Lee,* 505 U.S. at 679, 112 S.Ct. 2701; *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. For a court to uphold a speech restriction as reasonable, "it

need not be the most reasonable or the only reasonable limitation." *Lee,* 505 U.S. at 683, 112 S.Ct. 2701 (quoting *United States v. Kokinda,* 497 U.S. 720, 730, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion)). Furthermore, "[i]n contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439. *Hawkins,* 170 F.3d at 1287.

■■■■ In this case the types of activities that Plaintiffs wish to engage are absolutely prohibited on the easement. No one entering the property pursuant to the pedestrian easement may engage in protest, pickets, distribution of materials, or like actions. Thus, the restrictions are content-neutral. The restrictions are rationally related to the legitimate governmental interest because such activities are incompatible with the property right held by the City, which is merely for "pedestrian access and passage only."

Plaintiffs complain that the CPB may conduct activities prohibited under the easement. However, any conduct of such activities by the CPB is in its capacity as the property owner and is unrelated to use of the easement.

■■■■ In making its determination that the easement's restrictions on the use of the easement as a nonpublic forum are reasonable in relation to the purpose served by the forum, the court places major reliance on balancing the rights of the private property owner in controlling the usage of its property against the claimed residual First Amendment rights the Plaintiffs wish to exercise on the City's pedestrian easement over the Property. That property owner, the CPB, paid what is undisputedly full market value for the property—a price that was not diminished

for the value of the pedestrian and other easements. The CPB has expended considerable monies to alter the property for a specific purpose, the same purpose for which it was sold by the City and acquired by the CPB. The court cannot find that the pedestrian easement, any more than the view corridor or the utility easements, is the kind and quality of a governmentally-owned property right that would allow members of the public to interfere with or harm the purpose for which the private property owner acquired the Property, built the Church Plaza and maintains the Church Plaza. Although strict incompatibility between the nature of the speech and the functioning of the nonpublic forum (the pedestrian easement) is not mandated to uphold restrictions,[7] such incompatibility is present in this case. The City's interest in the easement is for the limited purpose of allowing pedestrians access to and passage over the Property. Prohibitions that prevent uses of the easement other than pedestrian passage are rationally related to maintaining the purpose of a pedestrian easement—passage over property. Prohibiting any protests, picketing, leafleting, erecting displays, using loud speakers to project music and the like on the limited easement is reasonable in light of the purpose of the nonpublic forum as a pedestrian easement.

This is especially true on the facts of this case where it is undisputed that the public still has unrestricted access to the extensive public sidewalks that border the Church Plaza on two sides as well as bordering the adjacent Temple Square and Church Administration Block.[8] In *Hawkins*, the Tenth Circuit held that its conclusions on the reasonableness of the restrictions at issue were "bolstered by the fact that ample alternative channels for communications remain available to" the

plaintiffs therein because they could have, by the alternative means reached a large portion of the persons using the nonpublic forum. 170 F.3d at 1291 at n. 7. The nearby Conference Center is also entirely surrounded by public sidewalks which remain open to the exercise of traditional free speech activities. *See* CPB Exs. 4 at ¶ 31 and 20 ¶ 4 (In year 2000, protests shifted from the south gate of Temple Square to North Temple street near the Conference Center because protestors locate themselves in the vicinity of the largest audience).

In addition, there is a rational government interest in the City's being able to obtain pedestrian easements in the future. For example, the City has a pedestrian easement over private property for the Bonneville Shoreline Trail in the City's foothills. CPB's Ex. 14. If pedestrian easements granted to the City burdened the property owners with the requirement of allowing pedestrians the right to congregate on the burdened property to protest, picket, leaflet, broadcast messages/music over loud speakers and other activities incompatible with access and passage, it would seriously impair the City's ability to obtain such easements for the benefit of the public.

▮ Moreover, under the circumstances of this case as established by the undisputed record before the Court, there exists no First Amendment right to associate on private property belonging to another.

Lastly, to the extent that Plaintiffs' claims are based upon actions arguably prohibited by the easement's restrictions against "offensive, indecent, obscene, vulgar, lewd or disorderly speech, dress or conduct" and the right under the easement

---

7. *Hawkins,* 170 F.3d at 1287 (quoting *Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439).

8. *Compare* Ex. 5 ¶ 36 and Cordova Aff. ¶ 26.

to exclude habitual violators, Plaintiffs have not claimed they want to engage in such conduct and have not shown that these provisions are likely to be enforced against them. Accordingly, there is no "direct and immediate dilemma" for Plaintiffs that could place an "inhibiting chill" on their First Amendment rights. Without the threat of enforcement of these provisions against Plaintiffs, a decision at this time regarding those provisions would entangle this court in an "abstract disagreement" about the provisions and their applicability. Thus, any such claims based on those provisions must await the time they are presented in "clean-cut and concrete form." *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d at 1499–1500.

Under the undisputed facts, the Property is not a First Amendment forum of any type and thus is not subject to the constitutional constraints claimed by Plaintiffs. Accordingly, Plaintiffs' Motion for Summary Judgment on their First Claim for Relief under the First Amendment will be denied and Defendant City's and Intervenor CPB's Motions for Summary Judgment on these claims will be granted.

### VIII Summary Judgment on Establishment Clause Claims

■ Plaintiffs move for summary judgment on their claim that the function of interpreting and enforcing the easement is a "traditional government function" and that by delegating that function to the landowner, "the LDS Church," the City violates the Establishment Clause. Plaintiffs rely on *Faneuil Hall* dicta to the effect that the power to decide who can use a public easement is an exclusive state function and therefore subject to constitutional scrutiny whether or not delegated to a private party, 745 F.Supp. at 72, and *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982) (Boston's statute giving churches, in effect,

veto power over issuance of liquor licenses, a traditional state function violated Establishment Clause).

The City and Intervenor move for summary judgment on the Establishment Claim on the basis that there is no evidence of collusion in favor of, or favoritism for, the LDS Church, the sale of the property meets the *Lemon* test for determining that it did not violate the Establishment Clause and there is no unconstitutional delegation of a traditional government function to a church.

Establishment Clause case law is notoriously confused and difficult. A recent case from the Tenth Circuit, *Bauchman v. West High School,* 132 F.3d 542 (10th Cir.1997), acknowledges this difficulty and sets forth the applicable law:

The First Amendment states the government "shall make no law respecting an establishment of religion." This prohibition extends to state government, including the Utah public schools, by operation of the Fourteenth Amendment.

Determining whether Ms. Bauchman has alleged facts sufficient to support her claim that defendants have violated this prohibition is not an easy task, as there is no bright line standard we can apply. The United States Supreme Court repeatedly has recognized *there can be no precise Establishment Clause test capable of ready application,* and therefore has resisted confining such sensitive analyses to "any single test or criterion." *Lynch v. Donnelly,* 465 U.S. 668, 678–79, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). .... To the extent the Supreme Court has attempted to prescribe a general analytic framework within which to evaluate Establishment Clause claims, its efforts have proven ineffective. Indeed, many believe the Court's modern Establishment Clause jurisprudence is in "hopeless disarray," *Rosen-*

*berger v. University of Virginia*, 515 U.S. 819, 861, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (Thomas, J. concurring), and in need of "[s]ubstantial revision." *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 656, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J. concurring in part and dissenting in part).

Our attempt to glean an appropriate standard for this case from existing, muddled Establishment Clause precedent begins with *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which is recognized as the benchmark case for Establishment Clause analysis. Applying *Lemon*, government action does not violate the Establishment Clause so long as it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement. 403 U.S. at 612–13, 91 S.Ct. 2105.

Beginning in the 1980s, however, the *Lemon* analysis came under vigorous attack by Justices and commentators alike.

\* \* \* \* \* \*

Acknowledging *Lemon's* weaknesses, Justice O'Connor seized the opportunity in *Lynch v. Donnelly* to draft a concurring opinion encouraging the Court to refine the *Lemon* analysis to focus more on whether the government is "endorsing" religion. 465 U.S. at 687–94, 104 S.Ct. 1355. Applying Justice O'Connor's refined analysis, the government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that "religion or a particular religious belief is favored or preferred." *County of Allegheny*, 492 U.S. at 592–93, 109 S.Ct. 3086; *see also Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 763, 115 S.Ct. 2440, 132 L.Ed.2d 650

(1995) (plurality); *Lynch*, 465 U.S. at 687–94, 104 S.Ct. 1355 (O'Connor, J., concurring). Recent cases suggest the purpose component of the endorsement test should evaluate whether the government's "actual" purpose is to endorse or disapprove of religion (*i.e.*, did the government intend to endorse or disapprove of religion); *Edwards*, 482 U.S. at 585, 107 S.Ct. 2573; *Jaffree*, 472 U.S. at 56, 105 S.Ct. 2479 (adopting Justice O'Connor's revision of the purpose component from *Lynch v. Donnelly*). The effect component, on the other hand, should evaluate whether a "reasonable observer," aware of the history and context of the community in which the conduct occurs, would view the practice as communicating a message of government endorsement or disapproval. *Capitol Square*, 515 U.S. at 779–81, 115 S.Ct. 2440 (O'Connor, J., concurring). Justice O'Connor's "endorsement test" is now widely accepted as the controlling analytical framework for evaluating Establishment Clause claims. *See* James M. Lewis & Michael L. Vild, A Controversial Twist of Lemon: The Endorsement Test as the Establishment Clause Standard, 65 Notre Dame L.Rev. 671 (1990). It would be wrong, however, to suggest the Court is unanimous in its adoption of the endorsement test. Moreover, even the Justices who have adopted the endorsement test do not agree on how it should be applied. *Id.* at 687–88. For example, although the Court has indicated a failure to satisfy the purpose component of the endorsement test alone is sufficient to invalidate government action, *Edwards*, 482 U.S. at 585, 107 S.Ct. 2573; *cf., id.* at 610, 107 S.Ct. 2573 (Scalia, J., dissenting) (questioning the premise that government action can be invalidated on the basis of motivation alone, without regard to the effect), the Court rarely has decided cases based

solely on the purpose component. *See Jaffree,* 472 U.S. at 75, 105 S.Ct. 2479 (O'Connor, J. concurring). When it has, the overriding religious purpose of the government action has been obvious, leaving little need to elaborate on the appropriate scope of the purpose inquiry. *See Edwards,* 482 U.S. at 613, 107 S.Ct. 2573 (Scalia, J., dissenting) (citations omitted); *Lynch,* 465 U.S. at 680, 104 S.Ct. 1355 (citations omitted). To the extent the Court has delved into the government's subjective intent in its evaluation of the actual purpose, such approach has been openly condemned by two members of the present Court— Chief Justice Rehnquist and Justice Scalia. *Edwards,* 482 U.S. at 610, 107 S.Ct. 2573 (Rehnquist, C.J, and Scalia, J., dissenting). According to Justice Scalia, who has proposed eliminating the purpose component altogether, discerning the government's subjective intent is "almost always an impossible task ... [t]o look for the sole purpose of even a single legislator is probably to look for something that does not exist." *Id.* at 636–37, 107 S.Ct. 2573. *Consequently, despite Sisyphean efforts, application of this component yields unprincipled results. Id.* at 636, 107 S.Ct. 2573; *Jaffree,* 472 U.S. at 112, 105 S.Ct. 2479, (Rehnquist, J., dissenting).

Having struggled to meaningfully apply the purpose component of the endorsement test to the alleged Establishment Clause violation in this case, we agree *it is an unworkable standard* that offers no useful guidance to courts, legislators or other government actors who must assess whether government conduct goes against the grain of religious liberty the Establishment Clause is intended to protect. Nevertheless, the uncertainty surrounding the present Court's position regarding the appropriate scope of the endorsement test and the appropriate Establishment Clause

analysis, in general, cautions us to apply both the purpose and effect components of the refined endorsement test, together with the entanglement criterion imposed by *Lemon,* when evaluating Ms. Bauchman's Establishment Clause claim.

*Bauchman v. West High School,* 132 F.3d at 550–52 (underlined emphasis added and citations partially omitted).

Plaintiffs appear to argue that *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), trumps the *Lemon* test. In *Larkin,* the Supreme Court held that independent of the first of the *Lemon* criteria (secular purpose), "by delegating a governmental power to religious institutions," the statute at issue "inescapably implicates the Establishment Clause" and therefore was declared void. The statute at issue in *Larkin* gave what amounts to veto power to churches over the issuance of liquor licenses. The Supreme Court found by giving churches a standardless veto power it was giving important discretionary power to be delegated to or shared with churches in violation of the Establishment Clause. 459 U.S. at 122–23, 103 S.Ct. 505.

Plaintiffs couple the *Larkin* ruling with the following language from *Faneuil Hall* for the proposition that deciding who may use an easement is a governmental function and under *Larkin,* it is a violation of the Establishment Clause for the City to have delegated the function to a church.

Indeed, the power to decide who can use a public easement goes beyond even that of a policeman. Unlike the policeman who merely executes decisions of policy, defendant here is actually making those policy decisions. Defendant's role is thus more like that of a legislature, which is even more clearly an exclusive state function. *The essential purpose of the easement here is to ensure public*

*access to the Marketplace. The exercise of control over the public's right to use the easement is subject to constitutional scrutiny, whether employed directly by the State or through delegation to a private party.*

*Faneuil Hall,* 745 F.Supp. at 72 (underlined emphasis added).

The Plaintiffs contend that the Warranty Deed gives the power to decide who uses the public to the CPB in several respects: by being able to decide who is offensive, lewd, etc., and therefore may be excluded under § 2.2 and by giving the power to "lawfully" exclude habitual violators of this standardless criteria under § 2.3

Intervenor CPB distinguishes *Faneuil Hall* because, as noted above, it is not exercising police power over who uses the easement. Instead, its security policy clearly shows that the City police need to be called to have anyone removed and if the police decline to move the person the CPB has its ordinary remedies available under state law. Pls.' Ex. 20 at § 2(c) ("West Church Plaza Security Policy") and CPB's Ex. 5 ¶ 33. Defendant City concurs in this position.

The CPB submits cases in support of its position that the enforcement of easements is not a traditional governmental function but rather is a matter left to private enforcement in state court. *E.g. State ex rel. Branton Family, L.P. v. Jackson County,* 880 S.W.2d 571 (Mo.App.1994) (dispute over proposed use of easement).

The Court rejects Plaintiffs' argument that under *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 123, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), the City violated the Establishment Clause by delegating to the LDS Church an exclusive governmental function. The alleged function at issue here is the right of the CPB under the Deed to exclude persons who exceed the scope of the pedestrian access easement.

Section 3 of the Warranty Deed, providing that Grantee may use all lawful means available to owners of private property to prevent any uses of the easements which are contrary to the provisions of the easement, is an acknowledgment that the landowner CPB is not granted any special status in the enforcement of the restrictions of the easements. Further, it is undisputed that the landowner's policy is to call the City police if the landowner finds it necessary to exclude persons.

As noted above, *Faneuil Hall* is distinguishable on its facts. In that case, private security police arrested demonstrators and physically excluded them from the property. Here there exists no genuine issue of material fact that except in cases where the nature of the conduct requires immediate lawful intervention "such as when the person presents an imminent danger to himself, others, or property"—the Property owner's policy is that it will call City police when an issue of enforcement or exclusion arises. See CPB's Ex. 60 (West Church Plaza Security Policy). Section 3 of the Deed provides the CPB may use all lawful means available to the owners of private property to prevent uses of the easement that are contrary to the rights granted in the Deed. Thus, it has not been delegated any exclusive state function or any special status or rights. In enforcing the limits of the easement over its property or in protecting any other of its property rights, the CPB has only those rights and powers which other private property owners enjoy. Having rejected Plaintiff's theory under their reading of *Larkin* and *Faneuil Hall,* the court turns to the traditional *Lemon* test.

Under the *Lemon* test, a government act does not violate the Establishment Clause if (1) it has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does

not foster an excessive entanglement of church and state. *Lemon* 403 U.S. at 612–13, 91 S.Ct. 2105. The Court finds that, on the undisputed facts before it, each prong of the *Lemon* test is met.

The secular purposes of the City's sale of the property to the CPB are numerous and undisputed. They are set forth in the Planning Commission's Report, CPB's Ex. 12, at 4–8 and 12. (Setting forth 17 broad secular purposes).

Among the secular purposes is the enhancement of the City's, and the State's, major tourist draw. The figures produced by the CPB are undisputed. Those figures show that literally millions of persons visit Temple Square each year, so many that it was nearly physically impossible to fit the crowds on the Temple Square grounds during the Christmas season when lights on Temple Square are a very popular attraction. CPB Ex. 26 ¶ 26. In the past, 3.5 to 9 million persons visited Temple Square and nearby LDS Church sites each year and in the near future those numbers are expected to increase dramatically. CPB Exs. 4 at ¶ 8 and Ex. 18 Kemp Aff. ¶ 4.

■ To state a claim under the effects component of the endorsement test, a plaintiff must allege facts indicating the sale has a principle or primary effect of advancing or endorsing religion.

United States Supreme Court precedent "plainly contemplate[s] that on occasion some advancement of religion will result from governmental action." *Lynch,* 465 U.S. at 683, 104 S.Ct. 1355. However, not every governmental activity that confers a remote, incidental or indirect benefit upon religion is constitutionally invalid. *Id.* Thus, as noted above, the Constitution does not forbid all mention of religion in public schools. The Establishment Clause prohibits only those school activities which, in the eyes of a reasonable observer, advance or pro-

mote religion or a particular religious belief. This is an objective inquiry, not an inquiry into whether particular individuals might be offended by the content or location of the Choir's performance, or consider such performances to endorse religion. *Gaylor,* 74 F.3d at 217. *Bauchman,* 132 F.3d at 555.

■ In this case, because the purchaser was the temporal arm of a church, there would naturally be a benefit to that church. However, incidental benefits to a religion from governmental action do not invalidate that action. *Bauchman,* 132 F.3d at 555. The CPB was the adjacent landowner and the owner of the subsurface rights. As such, under City policy it is the only party to whom the City would have sold the surface rights. Cordova Aff. ¶ 23. The closure and sale of streets and alleys is common in the City, including for purposes such as the promotion of tourism, and such sales have been made to other churches. *Id.* at ¶ 24 and Ex. C; Meeker Aff. Ex. B (City Council's street closure policy); Patterson Aff. ¶¶ 15 and 16 and Ex. E (list of City's street closures 1970 through 1999).

A reasonable observer aware of the context, purpose and history of city planning in Salt Lake City, "including the historical tension between the government and the Mormon Church," 132 F.3d at 555, the historic presence of LDS Church property in the center of the City, and the millions of annual visitors to such LDS Church property, would not find that the result of the City's acceptance of a full market value price for the surface rights to the Property had the principal or primary effect of advancing religion. Rather, a reasonable observer would find the principal or primary effects of the sale are those stated secular purposes the City expressed when it made the sale, including the enhancement of its major tourist attraction.

■ The entanglement analysis typically is applied to circumstances in which the state is involving itself with religious activity or religious institutions. *See Florey v. Sioux Falls School Dist., No. 49–5,* 619 F.2d 1311, 1318 (8th Cir.1980) (school board's policy on Christmas program). In this case the City has not entangled itself in the recognized religious activities of the CPB or the LDS Church by selling the CPB real property for full market value. To have refused to make an otherwise justified sale solely because the purchaser was the temporal arm of a religious organization or because the Property would be used by its new owner for religious purposes would have shown perhaps unconstitutional hostility to religion. This is especially true as other City streets or alleys have been closed and sold to other organizations, including other churches.

Further, the court agrees with the CPB's contention that to try to promulgate and enforce speech restrictions against the property owner's use of its own property to communicate its religious message would excessively entangle the City in the property owner's exercise of its freedom of religion. Consequently, the court perceives no state involvement with religious activity or excessive entanglement of church and state under the undisputed facts of this case.

Thus, under the *Lemon* test, there is no Establishment Clause violation. The Utah Constitution's establishment clause is also not violated on the undisputed facts.

Finally, the court finds no evidence in the record to support Plaintiffs' position that the events leading up to the sale somehow violated the Establishment Clause.

Accordingly, Plaintiffs' Motion for Summary Judgment on this claim should be denied and Defendant City's and Intervenor's Motions for Summary Judgment on the Establishment Clauses of the U.S. Constitution and the Utah Constitution will be granted.

### IX Summary Judgment on Equal Protection Claims

■ The City and the Intervenor move for Summary Judgment on this claim claiming that Plaintiffs have failed to show that the sale denied the equal protection of the law.

■ The Equal Protection Clauses of the U.S. Constitution and the Utah Constitution protect against discrimination amongst similarly-situated individuals. *Malan v. Lewis,* 693 P.2d 661 (Utah 1984) and *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).

■ Because the court has determined that the property is not a public forum, the classifications need only be rationally related to a legitimate government interest. *ACLU v. City of Las Vegas,* 13 F.Supp.2d 1064, (D.Nev.1998).

In this case, there is no denial of Equal Protection because in a nonpublic forum, the property owner's use of its property for speech purposes is not similarly situated to the use of pedestrians under an easement limited to "pedestrian access and passage only."

No other persons are allowed to use the easement for the prohibited activities in which Plaintiffs wish to engage. The fact that the property owner can engage in activities on its own property, and that the easement acknowledges that right, does not mean that the property owner is treated differently under the easement—its right to use the property flows from ownership, rather than from use under the easement and, therefore, the different treatment does not cover similarly-situated individuals.

Further, the court has already found, *supra,* that the restrictions in the ease-

ment are rationally related to the legitimate governmental interests in the easement.

 The Intervenor is correct that the Plaintiffs admit they have no direct evidence of intentional discrimination in connection with their equal protection claims. Where there is no evidence of intentional discrimination and no similarly-situated class being treated differently, the court need not examine the history of the sale under the test for determining whether invidious discriminatory purpose was a motivating factor in the governmental action set forth in *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

Further, to the extent that the Equal Protection claim seeks to review the disputed "offensive, indecent, obscene, vulgar, lewd or disorderly speech, dress or conduct" provision of § 2.2 or the "Exclude Habitual Violators" provision of § 3, Plaintiffs' challenge is not ripe for the reasons stated above in connection with the Free Speech challenge to such a claim.

There are no material issues of fact on the Equal Protection Claims under the federal or Utah Constitutions. Based upon the foregoing, the Court finds that Plaintiffs have failed to come forward with issues of facts upon which a reasonable finder of fact could find in their favor on their equal protection claim. Accordingly, Plaintiffs' Motion for Summary Judgment on this claim will be denied and Defendant City's and Defendant Intervenor's Motion for Summary Judgment on the Equal Protection claim under the U.S. Constitution and the Utah Constitution will be granted.

X   Conclusion and Order

Based upon the foregoing, it is therefore

ORDERED that Defendant Salt Lake City Corporation's and Intervenor CPB's Motions for Summary Judgment on Plaintiffs' First, Second and Third Claims for

Relief, including Plaintiffs' supplemental State constitutional claims, are GRANTED. It is further

ORDERED that Plaintiffs' Motion for Partial Summary Judgment is DENIED.